CHUN KING SALES, INC. v. COUNTY OF ST. LOUIS.

98 N. W. (2d) 194.

August 14, 1959—No. 37,583.

376

*Reavill, Jenswold, Neimeyer & Johnson* and *John D. Jenswold,* for appellant.

*Miles Lord,* Attorney General, *Thomas J. Naylor,* County Attorney, and *Ralph J. Olson,* Assistant County Attorney, for respondent.

MURPHY, JUSTICE.

This is an appeal from an order of the District Court of St. Louis County denying a petition for relief from assessment for real estate taxes. The appellant, Chun King Sales, Inc., purchased the plant and property involved from the State of Minnesota pursuant to a contract entered into with the Iron Range Resources and Rehabilitation Commission, which we will hereafter refer to as I.R.R.R.C.

It appears from the record that Chun King Sales, Inc., is a Minnesota corporation engaged in processing, packaging, and selling prepared food products. On September 18, 1950, it purchased certain industrial land located in Duluth for the sum of $8,830. The deed did not convey the buildings or other personal property. It recited that these had been concurrently sold to the State of Minnesota and were to remain personal property. The state, pursuant to an agreement with Chun King, had purchased the buildings and other personal property located on the

site from the Universal Match Corporation for $51,170.[1] It appears that this arrangement was made in pursuance of authority granted by the legislature to the I.R.R.R.C. for the purpose of alleviating distress and unemployment in St. Louis County. It was comprehended that the Chun King Sales company would set up a processing plant, thereby providing a market for the agricultural products of that area and at the same time giving employment to people in that community.

On September 25, 1950, the State of Minnesota, through the commissioner of I.R.R.R.C., entered into an agreement whereby Chun King agreed to convey its title to the land involved to the state and the state agreed to purchase the buildings and other personal property for $51,170 and to spend an additional $148,830 on equipment and repairs. Pursuant to this agreement Chun King executed a deed to the State of Minnesota on September 25, 1950. This deed contained a reverter clause that if Chun King should purchase the building prior to January 1, 1971, the title to the land should revert to it. On the same date, September 25, 1950, the commissioner entered into a lease with Chun King covering both land and buildings. This lease was for a period of 5 years from January 1, 1951, and could be renewed by the state at its option for three successive terms. The lease contained rental provisions calling for rentals during the first 9 months at a flat rate and thereafter on a percentage of net sales with provisions for minimum payments.[2]

---

[1]As applied to the issues before us, this purported severance of ownership has no legal effect since M. S. A. 272.03, subd. 1, requires that both land and buildings be included in the term "real property" for tax purposes. La Paul v. Heywood, 113 Minn. 376, 378, 129 N. W. 763, 764, 32 L.R.A. (N.S.) 368:

"* * * Under the law of Minnesota all buildings and improvements are for the purpose of taxation considered a part of the real estate, and must be assessed as such."

[2]"Commencing September 1, 1952 and for and during the remainder of the term of this lease at the rate of one-half of one per cent (1/2 of 1%) of Chun King's net sales of finished food products produced by it at said plant (net sales being defined as gross sales less credits for returns, trade discounts and allowances and delivery and transportation costs born [sic] by Chun King) hereinafter denominated 'royalties,' but not less than Ten

The lease provided, however, that during the term of the lease or any renewal thereof but not later than January 1, 1971, Chun King could purchase the buildings at "competitive bidding" for an amount not less than the highest bid offered and could get credit against the purchase price for the amount paid the state under the lease and contract.[3]

---

Thousand Dollars ($10,000.00) for each full calendar year of said remainder of said term and not less than Three Thousand Three Hundred Thirty-three and 33/100 Dollars ($3,333.33) for the period from September 1, 1952 to December 31, 1952, both dates inclusive, hereinafter denominated 'minimum rental.' Said minimum rental shall be payable to the Treasurer of the State in equal monthly payments of Eight Hundred Thirty-three and 33/100 Dollars ($833.33) on or before the first day of each month commencing September 1, 1952, during the remainder of said term. On or before the first of February, 1953, Chun King shall pay to the Treasurer of the State the amount, if any, by which said royalties computed on its sales for the period from September 1, 1952 to December 31, 1952, both dates inclusive, exceeds the said minimum rental payable during said period and on or before the first days of February, 1954, 1955 and 1956 shall likewise pay to the Treasurer of the State the amounts, if any, by which said royalties so due shall exceed the minimum rentals payable during each of the respective calendar years 1953, 1954 and 1955, Chun King's net sales and said royalties being computed upon its sales during each of said respective periods."

[3]The agreement and lease contain the following provision:

"Within the term of said lease or any renewal thereof, the lease or renewal thereof being then in full force, and Chun King not being in default, but in no event later than January 1, 1971, Chun King has the option to purchase the pilot plant described in paragraph I hereof, including said buildings and appurtenances therein described at an amount not lower than that offered by any other competitive bidder, subject to the right of the State to reject all bids for said plant which are for less than the total amount of money which has been paid out by the State on account of said plant and all money which has been encumbered by the State as required by law on account of said plant and not paid out, all prior to the date of the conveyance of said plant by the State to Chun King. *If, on demand of Chun King the Commissioner elects to fix the price at an amount not lower than that offered by any other bidder, he shall notify Chun King in writing, and if Chun King fails to purchase the plant at such price within thirty (30) days from the date of such notice, its option to purchase said plant shall*

Chun King took possession of the premises on January 1, 1951. At the expiration of the first 5-year period, the lease was renewed for an additional 5 years from December 31, 1956, the expiration date of the first leasehold period. Neither the agreement nor the lease made any provision for payment of real estate taxes.

On May 2, 1957, pursuant to the provisions of the agreement, the state at the request of Chun King advertised the plant for sale on competitive bids. Pursuant thereto the buildings and other personal property were sold by the state to Chun King on May 29, 1957, for the sum of $200,000. While nominally the sale was advertised on a competitive basis, it is obvious that Chun King had a preferred advantage by reason of the fact that under its agreement and lease with the state it was entitled to be credited with all of the payments it had made during the term of the lease and agreement. Pursuant to the agreement the bid of $200,000 representing the amount the state had invested in the property was made by Chun King. Of this amount Chun King paid $32,686.19 in cash since it was entitled to credit of the $167,318.81 previously paid.

It should be noted at this point that all of the conditions and agreements set forth in both the contract and lease entered into by the I.R.R.R.C. and Chun King were carried out and both contracts are executed.

On December 28, 1954, the commissioner of taxation requested that an omitted property assessment be entered against the property.[4] This was not done until March 16, 1956. The amount of the assessment was $30,749.17.

---

*terminate forthwith. In the event of the purchase of said plant by Chun King any payments of royalty or rental pursuant to the terms of the lease hereinabove referred to shall be credited to Chun King as part payment on the purchase price to be paid by it.*" (Italics supplied.)

[4]Real estate taxes are assessed and enforced against the land itself. They are not charges against the owner of the estate. Proceedings to enforce them are strictly in rem. 18 Dunnell, Dig. (3 ed.) § 9281, and cases noted thereunder; In re Petition of S. R. A., Inc. 213 Minn. 487, 7 N. W. (2d) 484.

Chun King contends that the assessment of taxes is invalid for the reasons: (1) That Chun King during the pendency of the agreement and lease had no taxable interest in the property, and (2) that the property was public property used for a public purpose within the constitutional exemption.

It may be assumed from the facts that during the pendency of the agreement and lease the record title to the property was in the State of Minnesota.

In substance, the transaction giving rise to transfer of title to the state comprehended that the I.R.R.R.C. would finance Chun King to the extent of $200,000. There were no express statutory provisions in effect at the time which authorized I.R.R.R.C. to accept a mortgage to secure the money advanced nor to enter into a contract for deed. Apparently it was considered that the method used in expressing the undertaking of the parties would protect the interests of both within the limits of existing law.

■ It is well established that property owned by the state or other public body is exempt from taxation both as a matter of policy and by specific constitutional or statutory provisions. 51 Am. Jur., Taxation, § 557. Minn. Const. art. 9, § 1, provides:

"* * * public property used exclusively for any public purpose, shall be exempt from taxation * * *."

Thus it is emphasized that public property to be exempted must be "used exclusively for any public purpose." State ex rel. Realty Co. v. Cooley, 62 Minn. 183, 64 N. W. 379, 29 L. R. A. 777.

■ The state may tax public property not exclusively used for a public purpose. The legislature has a wide discretion in classifying property for the purpose of taxation provided its classifications are based upon differences which furnish a reasonable ground for resulting distinctions between several classes. The legislature may determine

---

It is unnecessary here to speculate as to the lien of the taxes on the property in question. That subject is discussed in In re Petition of S. R. A., Inc. 213 Minn. 487, 497, 7 N. W. (2d) 484, 489, wherein it is noted that in the event of a tax sale "If it be land owned by the state, all taxes are cancelled and the land reappraised and sold anew."

the purposes for which taxes are levied, the extent of taxation, the apportionment thereof, and the property or class of persons upon which a tax shall operate, subject to the limitation that taxes levied be for a public purpose. General Mills, Inc. v. Division of Employment and Security, 224 Minn. 306, 310, 28 N. W. (2d) 847, 849; Hassler v. Engberg, 233 Minn. 487, 508, 48 N. W. (2d) 343, 356. Pursuant to this authority the State of Minnesota has enacted M. S. A. 273.19, which provides:

"Property held under a lease for a term of three or more years, or under a contract for the purchase thereof, when the property belongs to the state, * * * shall be considered, for all purposes of taxation, as the property of the person so holding the same."

It is clear from this provision that, where public property is held by a person or corporation under a lease or arrangement in the nature of a contract for purchase for a term of 3 years or more and has been appropriated to private uses, that property shall share in the burden of taxation the same as all other property. United States v. City of Detroit, 355 U. S. 466, 78 S. Ct. 474, 2 L. ed. (2d) 424; United States v. Township of Muskegon, 355 U. S. 484, 78 S. Ct. 483, 2 L. ed. (2d) 436. The lawful possession of property is a valuable right when the possessor can use it for his own personal benefit. While § 273.19 does not recite that the tax is for the privilege of using or possessing the property, it is nevertheless apparent that it is the intention of the legislature that where public property is used by private persons under a lease or contract from the state it is to be treated for taxing purposes the same as real estate owned by private persons. Tilden v. County of Orange, 89 Cal. App. (2d) 586, 201 P. (2d) 86; San Pedro, L. A. & S. L. R. Co. v. City of Los Angeles, 180 Cal. 18, 179 P. 393. When an interest in land for more than 3 years is severed from the public domain and put into private hands, the natural implication is that it goes there with the ordinary incidents of private property and, therefore, is subject to being taxed.

■ When the parties entered into the contract and lease before us, they did so with full knowledge of the provisions of § 273.19. It may be assumed that having been aware of that provision of the statute

they recognized that the real estate, being rented for a period of more than 3 years, would be subjected to taxation.

Chun King claims, however, that the provisions of § 273.19 do not apply because the written lease was invalid. This contention rests upon the assertion that the power to lease state property is delegated to the commissioner of administration, whose authority to rent state property is limited by the provisions of § 16.02(13) for a term not to exceed 2 years at a time.[5] Chun King argues that, since on the date that the original lease and agreement were made the commissioner was without authority to enter into a 5-year lease with renewal provisions, the state "cannot now contend that it has the right to bind Chun King to such a lease when Chun King, as lessee, had no right to bind the State."

In considering the import of the contract and lease as they bear upon the issue before us, it should be kept in mind that when the state enters into a contract in its proprietary capacity its rights and liabilities are the same as a private person and that contracts entered into by one of its officers in excess of his authority may be ratified by the legislature.[6]

Chun King recognizes that the 1955 legislature amended § 16.02(13)

---

[5]M. S. A. 1953, § 16.02, provides: "Subject to other applicable provisions of Laws 1939, Chapter 431, as amended, and to other laws not inconsistent therewith, the commissioner shall have the following powers and duties respecting all agencies of the state:

\* \* \* \* \*

"(13) To rent out, with the approval of the governor, any state property, real or personal, not needed for public use, the rental of which is not otherwise provided for or prohibited by law; this shall not apply to state trust fund lands, or other state lands under the jurisdiction of the department of conservation, or to property under the jurisdiction of the conservator of rural credit, or to lands forfeited for delinquent taxes; no such property shall be rented out for a term exceeding two years at a time."

[6]17 Dunnell, Dig. (3 ed.) § 8828; 49 Am. Jur., States, Territories, and Dependencies, § 58; State v. Horr, 165 Minn. 1, 205 N. W. 444; Reed v. Seymour, 24 Minn. 273; State of Wisconsin v. Torinus, 24 Minn. 332; Id. 26 Minn. 1, 49 N. W. 259; Id. 28 Minn. 175, 9 N. W. 725; 42 Am. Jur., Public Administrative Law, § 27; 81 C. J. S., States, § 123; Vorbeck v. City of Glencoe, 206 Minn. 180, 288 N. W. 4.

(L. 1955, c. 323) by validating all leases made by I.R.R.R.C. for a period of more than 2 years. This amendment was approved April 5, 1955, prior to the expiration of the first 5-year period, which was December 31, 1956, and prior to the making of the assessment March 16, 1956. The amendment to § 16.02(13), so far as applicable here, ratifies the original lease by adding the following provision:

"* * * *Any rentals of property heretofore made under Minnesota Statutes 1935, Section 298.22 for more than two years are hereby validated.*"

By the contract and lease Chun King was placed in possession of the premises for a period of not less than 5 years. The fact that the commissioner acted in excess of his authority in committing the state to a lease beyond a 2-year period does not change the determinative fact that Chun King did in fact go into possession of the property under an arrangement pursuant to § 298.22 under which Chun King would have at least 5 years to operate the plant. Although the lease could be said to have been void at the option of the parties, they both engaged in the execution of its terms, thereby establishing such a relation between themselves as the law will recognize. 32 Am. Jur., Landlord and Tenant, § 51. Whether the transaction under which Chun King took possession is called a mortgage, a lease, or a contract for purchase, the fact remains that when Chun King entered into possession it did so for a term of more than 3 years and, having done so, the property became subject to taxes "in the same manner as other property" and should be "considered, for all purposes of taxation, as the property of the person so holding the same."

Thus, the contract and lease were ratified both by the act of the legislature and by the acts of Chun King in using the property, in paying the rentals or purchase money, and in exercising its option to purchase. It cannot be said under the circumstances that substantial rights of Chun King were impaired by the retroactive validation of the lease. The rights they secured and from which they benefited were confirmed by the validation.

■ While Chun King seems to concede that the effect of the amendments to §§ 16.02(13) and 298.22 was to protect its rights under the

lease and contract, it nevertheless asserts that those amendments could in no way have any bearing on the question of whether or not the property might be subjected to real estate taxes. They say, "The primary reason * * * that the three-year lease statute has no bearing is that the exemption continues if the property continues to be public and used exclusively for a public purpose." It therefore appears that Chun King claims that while it was operating the packing plant from the period January 1, 1951, when the lease began until it finally got title to the property in May 1957 the property was being used for a public purpose. In support of this contention Chun King cites Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So. (2d) 394, involving validity of a bond issue to acquire industrial sites for private industry and the construction of buildings thereon; In re Opinion of the Justices, 99 N. H. 528, 114 A. (2d) 514, involving the validity of an act creating an industrial park authority empowered to acquire land and construct industrial buildings for private use; City of Fernandina v. State, 143 Fla. 802, 197 So. 454, involving the legality of the payment of $25,000 to a business promotion specialist to induce a pulp firm to locate within the city; Miller v. State Apple Comm. 296 Mich. 248, 296 N. W. 245, involving the validity of a statute levying an excise tax on apples, the proceeds to be used for the exclusive purpose of advertising and promoting the sale of that commodity; State v. Vahlsing, Inc. 147 Me. 417, 88 A. (2d) 144, involving an excise tax levied on potatoes produced in the state, the proceeds of which were to be devoted to investigation of better methods for production, shipment, and merchandising of that product; Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635, relating to the constitutionality of certain acts providing for the financing of reclamation of land and construction of terminal port facilities; Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175, involving the validity of legislation providing for low-cost housing; and Holen v. M. A. C. 250 Minn. 130, 84 N. W. (2d) 282, involving an action to enjoin issuance of bonds to finance improvement and development of an airport. These and numerous other cases of like import do not control. There is a clear distinction between *public purpose* involved in these authorities and *public use* as comprehended by

Minn. Const. art. 9, § 1. If we had before us an action raising the issue of the right of I.R.R.R.C. to advance $200,000 to finance the Chun King packing operation, these authorities might be in point. The authorities cited involve issues relating to the appropriation and expenditure of funds for public purposes in the advancement or promotion of undertakings which are to the benefit of the general public. While a *public purpose* authorized the I.R.R.R.C. to advance $200,000 for this project and the public at large benefited in a general way, that circumstance did not clothe Chun King with the character of a public agency or alter the fact that the *use* was a *private use*. It cannot be argued that in conducting its packing plant Chun King was fulfilling a public purpose or occupying its property for the benefit of the public any more than other companies who provide employment and markets in the area. Chun King used the property for its private purposes. The charges fixed by the state for the use of the property produced $167,318.81 in a period of less than 6 years. The state permitted Chun King to apply this sum to the purchase price of the plant. The direct and exclusive benefit of the use to Chun King is obvious.[7]

---

[7] As bearing upon the public purpose of the enterprise conducted by Chun King, certain aspects of the contract may be observed. Chun King was not required under this contract to limit the purchase of its produce to Minnesota. The contract provides:

"Chun King in making its purchases in its use of celery, onions and poultry for processing in said plant shall give preference to such products produced within Minnesota and particularly within St. Louis County *provided the price at which the same may be purchased, delivered at said plant, shall not exceed the price at which similar products of like quality may from time to time be purchased and delivered at said plant from sources without the State.*" (Italics supplied.)

The contract further provides that Chun King would "afford the use of the facilities of said plant" for refrigeration or storage of certain products to other food processors within St. Louis County, provided such accommodation would "not unreasonably interfere with its own requirements of such facilities, at reasonable charges and upon a basis uniform and nondiscriminatory to all applicants therefor." The contract contains the following provision:

"* * * In the event that letters patent shall, during the term of said contract or this lease and any renewal thereof, be applied for or issued

We think that the conclusion that the use of the property by Chun King was for a private and not a public purpose is supported by our authorities. In County of Anoka v. City of St. Paul, 194 Minn. 554, 261 N. W. 588, 99 A. L. R. 1137, it was claimed that an entire tract of more than 1,500 acres of property was public and immune from taxation. This property was used for a municipal waterworks for the purpose of supplying water to the inhabitants of the city of St. Paul. It also supplied water to neighboring municipalities. A small part of the tract was leased by the city to private persons for agricultural purposes. While conceding that municipal property used for municipal waterworks was public property under Minn. Const. art. 9, § 1, which was exempt from taxation, we emphasized that such exemption applies to public property *only when used exclusively* for any public purpose. We held that that part of the waterworks property which was rented out for agricultural purposes was taxable in Anoka County where it was located. We said (194 Minn. 557, 261 N. W. 590):

"* * * Consequently, the determinative consideration here is the *use* to which the city put this acreage which it owns in Anoka county. If the city used and is using this land for a nonpublic purpose then

to Chun King or any of its officers or employees upon any such process, any person, firm or corporation * * * will be granted forthwith for the term of this lease and any renewals thereof a license by Chun King for the full term of said letters patent and any and all extensions thereof, to use the processes covered thereby without payment of royalty or charge to Chun King."
The force and effect of these provisions are not entirely clear. If they have any bearing on the question of the public character of the operation of Chun King, the brief does not indicate it.

While this operation has been referred to as a "pilot plant" it is not correct to say that it was entirely experimental and speculative. The report of the I.R.R.C., 1950-1952, p. 8, contains the following:

"Duluth now has a firmly established $4,000,000 business that benefits a wide area thanks to the helping hand of the state through the Iron Range Resources and Rehabilitation Commission. The business is Chun King Sales, Inc., producer of oriental foods. It was already well established when Jeno F. Paulucci, the president, came to the commission for a helping hand. He needed money to expand."

the land is not tax-exempt. If, on the other hand, the city is using this land in its capacity as an agency of government for a public purpose, then it is tax-exempt. It cannot be said that the city is acting in its governmental capacity when it purchases land and leases the same to private parties for a stipulated rental." (Italics supplied.)

The fact that the property of the city was involved there and not that of the state does not alter the rule of law. Sanborn v. City of Minneapolis, 35 Minn. 314, 29 N. W. 126, and Foster v. City of Duluth, 120 Minn. 484, 140 N. W. 129, 48 L.R.A. (N.S.) 707, are not particularly helpful.

In State v. Browning, 192 Minn. 25, 29, 255 N. W. 254, 256, in discussing the application of Minn. Const. art. 9, § 1, and defining the word "public" as it applies to hospitals, we held that it was contemplated that a public hospital should be operated for the benefit of the public in contradistinction to the benefit of a private individual, corporation, or group of individuals. We there said:

"* * * So construed, 'operated for the benefit of the public' means operated without an intent to make a private profit. * * * The controlling feature is whether the institution was built, organized, and/or is maintained with an intent to make a private profit, not whether there happens to be a profit in any given year."

For a public hospital to gain exemption to taxation we said (192 Minn. 30, 255 N. W. 256):

"* * * It must be open to the public generally, and it must be operated for the benefit of the public, and thus without a private profit."[8]

Chun King's situation should be distinguished from Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175. A housing authority may be exempt from taxation as public property or property held or owned by a municipality within the

---

[8]See State ex rel. Realty Co. v. Cooley, 62 Minn. 183, 64 N. W. 379, 29 L. R. A. 777, where we held that private property used exclusively as a public market and retained as such by a municipality is not public property when the owner receives and retains all the rents and profits therefrom.

meaning of enactments exempting or authorizing the exemption from taxation of public property or property owned or held by a municipality. The housing authority is an administrative agency of a city and is therefore, for certain purposes, a governmental unit entitled to tax exemption. 51 Am. Jur., Taxation, § 568. The property in the case before us was occupied and used primarily and principally by Chun King for the purpose of raising revenue. It is recognized that the legislature may have the power to exempt manufacturers and manufacturing enterprises from taxation as a matter of public or governmental policy when its powers in this respect are not limited by the state constitution. In those circumstances, however, the person or corporation claiming the exemption must affirmatively show that it is within the class to which the statutory exemption applies, and it is only where the exemption is shown in terms clear and unequivocal that the right of exemption can be maintained. 51 Am. Jur., Taxation, §§ 593, 594.[9]

■ The next issue raised by Chun King is that certain alleged defects in the assessment procedure demand invalidation of the tax. This claim is based on the facts that (1) the omission was discovered in December 1954 but the assessment was not made until March 1956, (2) the assessment was not made against the tax list for the current year (1956) but against the 1955 records, and (3) the assessment was made against the state, not Chun King. The claim is based on § 273.02, subd. 1.[10] This contention must fail in view of our

[9]See Board of Park Commrs. v. Board of Tax Appeals, 160 Ohio St. 451, 454, 116 N. E. (2d) 725, 728, in which the Ohio Supreme Court took an alternative approach on facts similar to the instant case holding that, "[w]hen public property is leased to a private corporation, it is no longer *public property* under the control of a governmental unit."

[10]M. S. A. 273.02, subd. 1, provides: "If any real * * * property be omitted in the assessment of any year or years, and the property thereby escape taxation, * * * *when such omission * * * is discovered the county auditor shall* in the case of omitted property *enter such property* on the assessment and tax books for the year or years omitted * * *; *and he shall assess the property, and extend against the same on the tax list for the current year all arrearage of taxes properly accruing against it* * * *. If any tax on any property liable to taxation is prevented from being collected for any year or years by reason of any erroneous proceedings

well-established rule that the proceedings in reference to the assessment, computation, and levy of taxes are merely directory in nature and, in the absence of substantial prejudice, any irregularity in such directory matters will not result in invalidation of the assessment.[11]

Affirmed.

KNUTSON, JUSTICE (dissenting).

I cannot agree that the attempt to tax this property is valid. In the first place, it seems to me that the property was exempt from taxation because it was used for a public purpose.[12] Any other conclusion would inevitably lead to the result that the state has expended money to acquire and equip this plant in direct contravention to Minn. Const. art. 9, § 1. Such conclusion would affect not only this project but many others in which the Iron Range Resources and Rehabilitation Commission has engaged.

The I.R.R.R.C. came into existence by virtue of L. 1941, c. 544, for the purpose of developing and encouraging the use of resources of the state in areas where distress and unemployment exists. Before money appropriated thereunder, or under subsequent amendments to the act, could be devoted to a proposed project, it was necessary that the commissioner determine that distress and unemployment existed by reason of the removal of natural resources and the decrease in employment resulting therefrom.

Funds were allocated by the commission to petitioner after the requisite determination had been made by the commission. Among other things, the commissioner found that distress and unemployment existed within St. Louis County on account of the removal of natural mineral and timber resources and the decrease in employment resulting therefrom and that the area was especially suited to the growing of celery and onions and the raising of poultry. In order to develop an industry which could use such products, the commissioner found:

---

* * * or other cause, the amount of such tax which such property should have paid shall be added to the tax on such property for the current year." (Italics supplied.)

[11]Lindahl v. State, 244 Minn. 506, 70 N. W. (2d) 866.

[12]Minn. Const. art. 9, § 1.

"* * * that it is desirable, necessary and proper *that a pilot plant* so constructed and equipped as to demonstrate the commercial feasibility of so refrigerating and storing such locally grown celery and onions and the evisceration, dressing and use of such locally raised poultry that the same may, during the growing and production seasons be processed, stored and preserved in quantity sufficient to permit the later use thereof throughout the year as principal ingredients in prepared canned food-stuffs which can be nationally marketed and sold; *that if such pilot plant proves the commercial success and feasibility of such operations* it will foster and materially increase the use of a large acreage of such land not now productively utilized and the employment of a considerable number of residents of said county in the growing and raising of such products, and that it is in the interest of the State and the welfare of its inhabitants that this be done and that the commercial success and feasibility of such pilot plant is reasonably assured; * * *." (Italics supplied.)

The commissioner further determined that this pilot plant could best be operated by someone experienced in the business as a lessee. He found—

"* * * that it is for the best interests of the State to have such *pilot plant* operated under appropriate terms and conditions by a lessee qualified by experience in operations of such character rather than by the Commissioner, * * *." (Italics supplied.)

If the commission had operated the pilot plant directly instead of by a lessee, there could be no doubt as to tax exemption. The fact that a lessee acts for the commission does not destroy the public nature of the project.

It was pursuant to that determination that the plant was leased to Chun King Sales, Inc. At the outset, it is apparent that no one knew whether the experiment would be successful or not. The I.R.R.R.C. has engaged in a great variety of projects. In its biennial report to the governor and the legislature, 1954-1956, for instance, it appears among other things that experimental plants have been established to produce plywood; hardboard from aspen; molded veneer products and other wood products; canning of rutabagas; find uses for peat; use of frozen

food products; and many others. Some of these plants have been operated, as was the Chun King plant, under a lease of equipment owned by the state.[13] It is evident from a reading of the biennial reports of the commission that some of the experimental plants have been much more successful than others. The experiment with peat apparently has been a costly and unsuccessful one. It so happened that the Chun King plant proved to be unusually successful, due probably to the efficient management of the lessee. But whether the plant was a success or a failure should not be determinative of the question whether the purpose for its establishment was public or private. To justify the expenditure of public money, a public purpose must be found in these activities. The rehabilitation of a distressed area, and the creation of employment therein, seem to be the only legal basis for such expenditures. If we are to hold that this plant was not operated for a public purpose, then clearly the state's money should not have been invested in it at all. Nor does the mere fact that there was some private interest involved deprive the activity of its public nature if the primary purpose was public.[14] It seems to me that this property was used exclusively for a public purpose, as that term has been defined in our cases, and that, so used, it was exempt from taxation.

But even if we assume that the property was taxable under M. S. A. 273.19,[15] it seems to me that there is another obstacle to the collection of this tax at the present time. It must be conceded that at the time the tax should have been assessed, assuming the property was taxable, the state was the owner of the property and petitioner was a lessee with an option to purchase it at the highest price obtainable on competitive bids. The property was carried on the tax rolls as belonging to the state. While respondents rely to some extent upon Land O' Lakes Dairy Co. v. County of Wadena, 229 Minn. 263, 39 N. W. (2d) 164, I think that the facts in that case and in this are so clearly distinguishable that nothing need be said about the case. In the opinion

[13]See report of I.R.R.R.C., 1954-1956, p. 12, et seq.

[14]Burns v. Essling, 156 Minn. 171, 194 N. W. 404; Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635.

[15]That section does not apply if the property is used for a public purpose.

above, that case is not discussed, apparently for the same reason, so I shall refrain from doing so.

Beginning, then, with the proposition that the state was the owner and Chun King was the holder of a leasehold interest, there are certain fundamental rules of law pertaining to the assessment and collection of real estate taxes that prevent the collection of this tax at the present time which are being completely ignored. In the first place, real estate taxes are not charges against the person. They are assessed and enforced against the land; they are a lien against the land. Proceedings to enforce them are strictly in rem.[16] For a nonpayment of the tax, the state can enforce it only against the interest which the taxpayer has in the land at the time the tax is assessed.

Applying these rules to the facts of this case, at the time the taxes the state now seeks to collect should have been assessed Chun King had nothing more than a leasehold interest in the land. The tax lien could be enforced only against that interest. Upon nonpayment of the tax, the most the state could do would be to cancel the leasehold interest or probably sell it to a purchaser if such could be found. In discussing this proposition in In re Petition of S. R. A., Inc. 213 Minn. 487, 497, 7 N. W. (2d) 484, 489, we said:

"* * * If there be tax default where no one is willing to take over the tax interests of the state, the practice is to cancel the contract. If it be land owned by the state, all taxes are cancelled and the land reappraised and sold anew."

Again assuming this tax to be valid, the state now seeks to enforce the lien it had on petitioner's leasehold interest against the fee which the state owned at the time the tax was assessed. This, it seems to me, cannot be done. If petitioner had chosen not to exercise its option to purchase, or a third party had bid more than petitioner was willing to pay and the property had been sold by the state to such third party, no one would claim, I should think, that the tax lien which the state had acquired would follow the fee into the hands of such third party. If that is true, petitioner, as the purchaser of the fee, stands

---

[16] 18 Dunnell, Dig. (3 ed.) § 9114a; In re Petition of S. R. A., Inc. 213 Minn. 487, 7 N. W. (2d) 484.

in exactly the same position as such third party would. The leasehold interest against which the state could have enforced its tax lien passed out of existence upon conveyance of the fee to petitioner. There is now nothing against which the state may enforce its lien.

It seems obvious that neither the state nor petitioner contemplated an attempt to tax this property when it was leased to petitioner. It was carried on the tax records as property owned by the state and as exempt from taxation. Now, apparently because petitioner has successfully accomplished what both parties sought to do, and as a result the state has been completely reimbursed, it seeks to recover still another bite. In the report of I.R.R.R.C., 1956-1958, p. 58, we find the following:

"Chun King and its related firms employ upwards to 1,000 persons a good share of the year. Complete recovery of the IRRRC funds became a reality on May 29, 1957.

"At that time Chun King Sales, Inc., according to the provisions of the contract with the State of Minnesota, asked that the plant be put up for sale. Chun King was awarded the bid for the plant and all IRRRC expenditures for this project were returned to the General Revenue Fund."

It seems to me that both from a standpoint of law and equity this decision should be reversed and the property held to be free from the tax which the state now seeks to impose.

Matson, Justice (dissenting).

I concur in the dissent of Mr. Justice Knutson. Prior to the exercise of its option to purchase in the year 1957, Chun King had neither legal nor equitable title to the property. It should not be overlooked that an option to purchase embodied in a lease is nothing more than an irrevocable and continuing offer to sell and conveys no interest in the land of the optionee but vests in him only a right in personam to buy at his election. Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. (2d) 362, 166 A. L. R. 435.