# JOHN T. LYONS v. G. HOWARD SPAETH.[1]

November 2, 1945.

No. 34,084.

[1]Reported in 20 N. W. (2d) 481.

*T. O. Streissguth, Philip L. Scherer,* and *Clifford W. Gardner,* for appellant.

*J. A. A. Burnquist,* Attorney General, *George B. Sjoselius,* Deputy Attorney General, and *David W. Lewis,* Assistant Attorney General, for respondent.

*Abbott, MacPherran, Dancer & Montague, M. J. Doherty* of *Doherty, Rumble, Butler, Sullivan & Mitchell, John B. Putnam,* and *Donald D. Harries* of *Gillette, Nye, Harries & Montague,* filed briefs *amici curiae* on behalf of the contention of respondent.

LORING, CHIEF JUSTICE.

This case comes here on an appeal from an order sustaining a demurrer to the complaint on the ground that it does not state a cause of action. Plaintiff seeks to have L. 1943, c. 590, § 3, relating to the occupation tax on the business of mining, held to be unconstitutional in its entirety.

At its 42d session the legislature enacted L. 1921, c. 223, which levied an occupation tax on all persons engaged in the business of mining "equal to 6 per cent of the valuation of all ores * * *." For the purpose of arriving at a basis for the tax, § 2 of c. 223 prescribed the deductions that should be subtracted from the value of the ore "at the place where the same is brought to the surface of the earth, * * *." They consisted of the cost of separating the ore from the ore body and conveying it to the surface; the proportionate cost of removing the overburden or sinking shafts and running drifts; the royalties paid; and a proportionate share of the ad valorem tax on the realty. The constitutionality of c. 223 was sustained by the Supreme Court of the United States in Oliver I. Min. Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. ed. 929, against the challenge that it violated the equal protection clause of the

Fourteenth Amendment and the uniformity clause in Minn. Const. art. 9, § 1.

At the same session at which c. 223 was enacted, the legislature submitted to the people a proposed constitutional amendment, which was adopted at the 1922 general election and became art. 9, § 1A. It required an occupation tax on every person engaged in the business of mining, on the valuation of all ores mined or produced in this state. It provided:

"* * * The valuation of ore for the purpose of determining the amount of tax to be paid shall be ascertained in the manner and method provided by law."

L. 1921, c. 223, § 2, was amended by L. 1925, c. 307, by restricting cost of separation to the cost "of *supplies used and labor performed at the mine.*" The rate of tax was raised to ten percent for 1937 and eight percent thereafter by Ex. Sess. L. 1937, c. 85. "For the purpose of increasing employment and the utilization of low grade ores," L. 1939, c. 356, classified the taxpayers engaged in mining such ores according to percentage of low-grade ores mined and graduated a reduction of the tax to the different classes. L. 1941, c. 544,[2] and L. 1943, c. 590,[3] included underground and high-labor-

[2]L. 1941, c. 544, § 3, provided: "For the purpose of increasing employment and the utilization of low-grade, *underground, and high labor cost* ores, *any taxpayer on whom a tax is imposed by reason of the provisions of Mason's Supplement 1940, Section 2373, shall be allowed a credit against the occupation tax as computed in said section because of the mining or production of ore from any mine in an amount equal to 10 per cent of that part of the cost of labor, excepting administrative labor, employed at said mine or in the beneficiation of such ore at or near said mine, in any calendar year, in excess of 20 cents per ton of the ore produced during that year; provided, however, that in no event shall the credit allowed hereunder be in excess of two-thirds of the total of the tax computed under the provisions of Mason's Supplement 1940, Section 2373.*"

[3]L. 1943, c. 590, § 3, amended L. 1941, c. 544, § 3, by substituting after the phrase "20 cents" the following: "*and not in excess of 30 cents* per ton of the ore produced during that year, *and an amount equal to 15 per cent of that part of the cost of such labor in excess of 30 cents and not in excess of 45 cents per ton of ore produced during that year, and an amount equal to 20 per cent of that part of the cost of such labor in excess of 45 cents per ton*

cost ores with the low-grade ores and provided for reclassification of the payers of the occupation tax by adjusting the tax to the classes created according to labor costs by giving additional credit for such costs to certain classes. L. 1945, c. 445, again changed the rates.

In the case at bar, the plaintiff assails the graduation feature of L. 1941 and L. 1943 on the theory that by art. 9, § 1A, the people of the state preëmpted the right of classification and established a single class for all mine operators, thereby limiting and prohibiting the legislature from classifying taxpayers within the general occupation of mining. He contends that, even if the legislature has the power to classify, the classifications are made without reasonable basis therefor. He also contends that using labor costs as a basis for further reducing the rate of taxation to miners of low-grade, underground, and high labor-cost ores, as provided in the 1941 and 1943 laws, is equivalent to a bonus or bounty to such operators and is not permissible as being in effect a use of public funds for a private purpose.

■ In order to clarify the issues thus presented, it seems desirable to contemplate the situation as it would have been were there no limitations in the state constitution in regard to the taxing powers. Had such been the case, the sovereign state, acting through the legislature, would have had the inherent power to levy an occupation tax and to classify the taxpayers where reasonable grounds for classification existed, restrained only by the equal protection clause in the federal constitution. Oliver I. Min. Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. ed. 929. Limitations which were incorporated in the original constitution were repealed by the amendment in 1906 of art. 9, § 1, commonly referred to as the "wide-open tax amendment." Aside from the matter of exemptions, all restraints upon the legislature's exercise of the sovereign power of taxation were, by that amendment, lifted, except the requirement that "Taxes shall be uniform upon the same class of subjects,

*of ore produced during that year;* provided, however, that in no event shall the credit allowed hereunder be in excess of *90 per cent* of the total of the tax computed under the provisions of Mason's Supplement 1940, Section 2373."

and shall be levied and collected for public purposes," which we have held to be no more restrictive than the equal protection clause of the Fourteenth Amendment. Reed v. Bjornson, 191 Minn. 254, 253 N. W. 102. This, in effect, left the legislature free to exercise the state's inherent sovereign right to tax and classify within the limitations of the Fourteenth Amendment. As said in Oliver I. Min. Co. v. Lord, 262 U. S. 179, 43 S. Ct. 529, 67 L. ed. 936, in commenting upon our uniformity provision and the equal protection clause:

"Consistently with both provisions the legislature of the State may exercise a wide discretion in selecting the subjects of taxation, particularly as respects occupation taxes. It may select those who are engaged in one class of business and exclude others, if all similarly situated are brought within the class and all members of the class are dealt with according to uniform rules. * * * Here the selection is of all who are engaged in mining or producing ores on their own account; * * *."

Did the people of the state by § 1A intend to preëmpt the field of classification and deprive the legislature of that power insofar as the occupation tax on the business of mining was concerned? While there can be little doubt that the submission of § 1A to the people was due to a lack of assurance on the part of the legislature as to its powers under art. 9, § 1, and that it was probably submitted solely to confirm the constitutionality of L. 1921, c. 223, nevertheless we look to the language of § 1A and to the surrounding circumstances to determine the people's intent. In Reed v. Bjornson, 191 Minn. 254, 258, 253 N. W. 102, 104, we quoted, with approval, Mr. Justice Sutherland's statement of the rule in regard to constitutional construction as follows:

"The whole aim of construction, as applied to a provision of the Constitution, is to discover the meaning, to ascertain and give effect to the intent, of its framers and the people who adopted it. * * * The necessities which gave rise to the provision, the controversies which preceded, as well as the conflicts of opinion which.

were settled by its adoption, are matters to be considered to enable us to arrive at a correct result. * * * The history of the times, the state of things existing when the provision was framed and adopted, should be looked to in order to ascertain the mischief and the remedy. * * * As nearly as possible we should place ourselves in the condition of those who framed and adopted it. * * * And if the meaning be at all doubtful, the doubt should be resolved, wherever reasonably possible to do so, in a way to forward the evident purpose with which the provision was adopted."

We apply that rule to the problem before us. The occupation of mining was already a proper subject of taxation, Oliver I. Min. Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. ed. 929, and the expressed effect of § 1A was to compel the legislature to subject it to taxation, with the further requirement that the tax on the occupation should be based upon the valuation of the ore mined. The attorney general[4] so summarized the purpose of the amendment in the required publications relative to the amendment prior to the 1922 election. Nothing was said about a restraint upon classification.

We therefore approach the question of whether, by implication, the people reserved to themselves all power to classify within the occupation. There is no history of mischief in the form of classification by the legislature which the people sought to remedy

[4]"The *purpose* of said amendment is to direct the legislature of the state of Minnesota to impose and to keep in effect an occupation *tax upon those* [italics supplied] engaged in the business of mining or producing iron ore or other ores in this state, in addition to other taxes imposed by law, at a rate, *based* [italics supplied] upon the valuation of the ore produced, to be determined by the legislature; and to provide for the proportionate distribution of such taxes to the general revenue fund, the permanent school fund, and the permanent university fund.

"The *effect* of the amendment, if adopted, will be to direct the legislature to impose and keep in effect such a tax upon those engaged in said business; and to require that the proceeds of such taxes shall be distributed in the manner following, to-wit: fifty per cent to the state general revenue fund, forty per cent to the permanent school fund, and ten per cent to the permanent university fund."

by adopting § 1A. The only classification then in force under c. 223 was that achieved by deductions from the surface value of the ore and which, apparently, the people were willing to leave in force by committing to the legislature the "manner and method" of fixing the value on which the tax was based. Nothing whatever is said in § 1A which could be construed as a requirement that the tax should be levied on all persons engaged in the occupation at the same rate on all ore mined, regardless of what reasons might exist for properly classifying the persons engaged in mining and subjecting them to different rates of taxation. The tax is on the occupation and not on the ore. The value of the ore, less deductions, merely furnishes the basis from which to measure the tax on the occupation. We so construe art. 9, § 1A. There would otherwise be no reason for designating the tax as an occupation tax. It is not an ad valorem tax on the ore as such. Labor cost was one of the deductions then in force under c. 223. Naturally, it varied with the kind and grade of the ore. This resulted in a variation of the tax on different operators although the ore, when finally mined and beneficiated, may have been of uniform value. Here was classification within the occupation. L. 1941 and L. 1943 were but extensions of that classification.

In commenting on the alleged discrimination due to the deductions, the Supreme Court said in Oliver I. Min. Co. v. Lord, 262 U. S. 181, 43 S. Ct. 530, 67 L. ed. 937:

"It also is said that the royalty provision and others respecting deductions will work a discrimination as between different lessees in that some will be subjected to a higher tax than others. No doubt there will be differences in the amount, but they will result from differences in situation and not from differences in treatment. Some lessees pay higher royalties than others and will secure a higher deduction on that score. Some are subjected to greater expense in mining than others and will secure reductions accordingly. And some are subjected to higher local taxes on their mines than others—the mines being scattered through several counties and minor municipal subdivisions—and this will cause

the deductions to vary. But all lessees will have the benefit of deductions adjusted to the royalties, expenses and taxes actually paid; and the value of the ore, according to which the tax will be computed, will in each instance be its actual value when it is brought out of the mine less those deductions. In short, the tax is to be adjusted to the value of the output less the major expenses of the business, and this according to uniform rules. We, therefore, cannot say that it is intended to or will work any arbitrary or unreasonable discrimination as between different lessees."

Had the people desired to terminate such method of arriving at the basis from which the tax was figured, would they have left their intent to implication instead of couching it in express language? Or would they have left to implication any desire to hold the legislature strictly to the "manner and method" of ascertaining the basis of the tax then provided by c. 223? We think the questions must be answered in the negative.

When the people adopted § 1A, they were aware that northern Minnesota contained vast bodies of low-grade ores. That fact had been known for decades. The utilization of these ores was of tremendous importance to the prosperity of the state and in time of war to the safety of the nation. To encourage their utilization was a legitimate public purpose. Does it seem probable that the people would, by mere implication, restrict and hamper the legislature from promoting the development of these ore bodies by requiring the same rate of taxation on the occupation of mining such ores as was imposed upon operators in the high-grade, low labor-cost ores which were generally expected to be exhausted in a few decades? Without specific words to that effect or other indications of intent, we should hesitate to read into the amendment by implication any such restriction. Moreover, we look in vain for any reasons supporting such an implied intent. Certainly, the amendment evinced no intention to deprive the legislature of the power to deduct from the value of the ore, after separation and beneficiation, such elements, other than those specified in c. 223, as in its wisdom it might reasonably decide should be deducted in ascertain-

ing the determinative value. Neither do we discover any intent, by implication, to restrain reasonable classification based upon proper deductions.

Art. 9, § 1A, of the constitution not only did not impose any limitation on the power of the legislature to classify, but, on the contrary, clearly left to the legislature the power to do so, because such authority was implied in the power left to it to ascertain the basis which determined the amount of the tax in the "manner and method provided by law." Such determination contemplates the enactment of legislation. The exercise of the legislative process necessarily involves classification. In Kellerman v. City of St. Paul, 211 Minn. 351, 355, 1 N. W. (2d) 378, 380, this court, speaking through Mr. Chief Justice Gallagher, said: "Legislation in its very nature involves classification, * * *." In 12 Am. Jur., Constitutional Law, § 476, the rule is stated in substantially the same language as in our Kellerman case, as follows:

"* * * As a matter of fact, as some of the courts have remarked, all legislation involves classification; * * *."

See, C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 514, 297 N. W. 9, 16; City of Xenia v. Schmidt, 101 Ohio St. 437, 448, 449, 130 N. E. 24.

It is true that L. 1941, c. 544, and L. 1943, c. 590, give a "credit" for high labor cost on the tax "computed" under previous provisions, which included deduction of labor cost, but the effect of these provisions was to reduce the rate of tax rather than to give a bonus or bounty. The use of the term "credit," instead of the phrase reduction in "rate" does not vitiate the classification. The action authorized is still in effect a reduction in rate of tax to operators falling within the classes described. We look to the substance and effect of the language in ascertaining the legislative intent. We see no distinction in the purpose of this language from that in L. 1939, c. 356, where the reduction provided for was from the "rate" of tax. If it was proper to use labor cost as a measure of arriving at the basis of the tax, it was proper to use high labor cost as a further element for consideration in fixing a basis for

classification of taxpayers, if all in the same situation were treated alike. The provision in regard to labor cost in the 1941 and 1943 acts merely gave high labor cost additional consideration as a factor in making classification of taxpayers. There is no reason why the legislature may not classify taxpayers in the same general occupation at different rates, according to the different cost of operating in the different classes of ore. There will be a difference in the rates between the classes, "but they will result from differences in situation and not from differences in treatment." Oliver I. Min. Co. v. Lord, 262 U. S. 172, 181, 43 S. Ct. 526, 530, 67 L. ed. 929, 937.

To summarize, the power of taxation is legislative in its nature and inherent in the sovereignty of the state. The previous restrictions incorporated in our constitution on the exercise of that power by the legislature were lifted by the 1906 amendment to art. 9, and there remained only the restrictions on the taxing power contained in the Fourteenth Amendment, which were no more nor less than those contained in the uniformity clause of the 1906 amendment; therefore, after the adoption of the 1906 amendment, the legislature had full power to tax occupations, such as the business of mining, and to classify within that occupation taxpayers who were similarly situated where reasonable grounds existed for such classification. We do not discover in the 1922 amendment either an expressed or implied restriction on the foregoing power of the legislature, but only a requirement that such an occupation tax be imposed and based upon the value of the ore, with such deductions therefrom in the "manner and method" of ascertainment of the tax as the legislature might, by law, provide. The fact that the language of the 1941 and 1943 laws, in their provision for classification within the occupation, used the word "credit" for higher labor costs in the mining of low-grade ores than those incurred in mining high-grade ores does not change the effect of those laws as reductions in the rate of tax, and we find that such classifications as those provided in the two laws last referred to are sustainable as proper classifications within the wisdom of the legislature.

The order appealed from must be affirmed.