In the Matter of the Petition of the UNITED STATES STEEL CORPORATION for a Determination of its objections to Taxes Imposed on Certain of its Properties Under Laws of Minnesota 1974, Chapter 556, Payable in the Year 1977.

UNITED STATES STEEL CORPORATION, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent and Cross Appellant,

County of Itasca, Respondent.

No. 51222.

Supreme Court of Minnesota.

Aug. 31, 1982.

Hanft, Fride, O'Brien & Harries, Edward T. Fride, Paul J. Lokken and Robyn N. Moschet, Duluth, for appellant.

Warren Spannaus, Atty. Gen., and Thomas K. Overton, Spec. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for respondent and cross appellant State of Minnesota.

Sonya C. Stevens, County Atty., Grand Rapids, for Itasca County.

OTIS, Justice.

These proceedings have been initiated by appellant, United States Steel Corporation, under Minnesota Statutes, Chapter 278, to challenge the validity of Minn.Stat. § 273.-02, subd. 4, imposing an omitted property tax on newly discovered iron ore.

The steel company appeals from the trial court's determination that the tax does not violate the fourteenth amendment of the Federal Constitution or article X, § 1, of the Minnesota Constitution.

The State cross appeals from the court's decision that Minn.Stat. § 273.02, subd. 6, is invalid insofar as it directs that the tax proceeds be distributed to the iron range resources and rehabilitation board account.

We affirm in part and reverse in part, and hold that the statute is valid in its entirety both with respect to the imposition of the tax and its manner of distribution.

The property in question consists of two forty-acre tracts in the City of Taconite, Itasca County, known as the Homestead Reserve, which appellants have owned since 1907 but have never mined. Immediately adjacent to the property is the Canisteo Mine which has been successfully operated by Cleveland Cliffs Iron Company during all of the years which are here relevant.

The trial court found that the ad valorem taxes paid by mining companies such as appellant were necessarily based on valuations which were the product of expensive and inexact test drillings. Consequently the State has not itself conducted such exploration but has relied entirely on the drilling done by the mining companies, and the productivity of other similarly situated areas where ore is actually mined. The trial court noted that this situation resulted in "overruns", which it defined as "a general word used in the mining industry to denote the phenomenon whereby the amount of iron ore mined exceeds the amount that had been estimated to exist in a particular mine for tax purposes."

The legislation which gave rise to this litigation was designed to correct what the legislature deemed to be the State's failure to collect from the mining companies their fair share of taxes on property which contained substantially larger deposits of minerals than the companies and the taxing authorities were aware of at the time the tax assessments were levied.

Accordingly, in the year 1974 the then existing Omitted Property Statute, Minn. Stat. § 273.02 (1980), was amended to add the following:

Subd. 4. Iron ore. Newly discovered iron ore shall be entered on the assessment books for the six years immediately

preceding the year of discovery and taxed as omitted property. The tax on such omitted property shall be determined by applying the rates of levy for the respective years in which the property was omitted.[1]

Subdivision 5 provides for rebates where property is overvalued. Subdivision 6 includes the following: After the payment of refunds "[t]he balance in such fund shall be distributed at the end of each fiscal year to the iron range resources and rehabilitation board account."

In 1975 appellant conducted a drill test on the Homestead Reserve which disclosed deposits of iron ore, not previously identified, in the amount of 62,547 tons. The State thereupon reassessed the property retroactively to increase the tax for each year beginning with 1969, to and including 1974.[2]

It has long been recognized that there is virtually no change of ownership in iron ore property on the Mesabi Range. Therefore, in the absence of comparable sales, the so-called Hoskold formula for many years has been utilized to arrive at market value in assessing property which is being mined. That method was described by us in *State v. Oliver Iron Mining Co.*, 198 Minn. 385, 399, 270 N.W. 609, 617 (1936), as follows:

> [T]he method according to that formula is one of estimating the future profits to be made from the venture, the time at which those profits will be received, and then computing present value under a plan which provides for the return of capital to the investor. It is based upon the assumption that as the ore is mined the income of each year must be considered partly as a return of capital and partly as a profit on the venture.

Where property such as the Homestead Reserve has not been mined, the application of that formula must necessarily hinge on the accuracy of determining by test drilling the quality and quantity of ore which could be profitably extracted sometime in the future. That is conceded to be an imprecise technique at best.

The trial court concluded that overruns stemmed from the mining company's selective and exclusive use of drill tests, and resulted in their failure to pay their just share of the tax burden. The court was influenced by the fact that "the ad valorem taxation of iron ore in Minnesota has historically been different from the taxation of other property in this state in the determination of the quantity of property to be taxed and in the valuation of the same", and found therefore that statutes of general application are not necessarily controlling in taxing iron ore.

Four principal issues emerge. *First*, under Minnesota statutes governing the assessment of ad valorem real estate taxes, is the determination of market value on January 2 of any given year subject to revision by the subsequent discovery of iron ore which enhances its value? *Second*, Does the equal protection clause of the fourteenth amendment of the Federal Constitution or the uniformity clause of article 10, § 1 of the Minnesota Constitution[3] prohibit the assessment of retroactive increases in taxes affecting only iron ore without including other minerals as well? *Third*, under Minn. Stat. § 273.02, subd. 2, is the tax one on "undervalued" property with a one year statute of limitations, or is it a tax on "omitted" property with a six-year statute of limitations? *Fourth*, under Minnesota's constitutional uniformity clause may the legislature permit counties other than those from which iron ore is extracted to benefit from the taxation of such ore?

■ 1. Appellant correctly points out that under our statutes real property includes land and minerals, Minn.Stat. § 273.-

---

1. Portions of the 1974 statute which were later amended or deleted and are not here relevant are omitted.

2. The record does not disclose the precise amount of the additional taxes, probably less than $4,000.

3. Taxes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes * * *.

03; that all property is to be valued at its market value including the value of mines or quarries on the property, Minn.Stat. § 273.11; and that market value means the usual selling price at the time of the assessment. It is argued that the land and minerals appellant owned on January 2nd each year from 1967 to 1974 were not omitted from, and did not escape taxation, but on the contrary were taxed on what was then deemed to be the fair market value. Furthermore, the statute not only discriminates against those with recent drillings but discourages exploration, appellant contends. Finally, appellant asserts that subsequent increases in value can never be considered after the assessment date has passed.

What distinguishes taxation of real property containing mineral deposits from ordinary commerical property are the difficulties to which we have alluded in ascertaining market value. Minn.Stat. 273.02, subd. 4 deals with the value of the unmined ore under the property rather than the value of the land above ground.

This presents unique, practical and technical problems which are not susceptible of resolution by orthodox procedures pursued in dealing with other kinds of real and personal property taxation. The concept that property which has eluded taxation altogether can be retroactively taxed is well established. We are aware of no contrary authority, or logical reason, why property such as iron ore should be treated any differently once it is discovered that the original tax was erroneously computed as a result of all of the parties concerned being ignorant of the facts. Reduced to its simplest terms the 62,547 tons of ore had been part of appellant's property since it was acquired in 1907 but was not discovered until 1975 and was taxed only from 1969. We find nothing in other statutes which conflict with the application of Minn.Stat. § 273.02, subd. 4, in this case.

The appellant contends that because the 62,547 tons of ore were not discovered before 1975 the market value of the property on the January assessment dates before 1975 could not possibly reflect the existence of that ore. It is true that without further drilling neither the owner nor the prospective buyer could be sure of the ore content. However, it is inconceivable that the so-called "willing buyer" would arrive at a purchase price without the kind of information appellant was able to obtain by drilling seven test holes in 1975.

Appellants ask in what respect this discovery differs from the inadvertent discovery of gold under an urban shopping area, or oil under a residential property. Could the legislature retroactively reassess the land for six years to reflect its increased value? We need not speculate on the answer since it seems highly unlikely the legislature would single out such an isolated and fortuitous possibility for special consideration. Here, we are not dealing with owners whose use and enjoyment of their property are totally removed from any intent to exploit sub-surface deposits. The appellants are owners whose only purpose since acquiring their property in 1907 has been to extract minerals. It isn't unreasonable to impose on them a higher duty to ascertain with some accuracy the true value of their property to make certain that the industry they operate bears its fair share of taxes imposed on others in the community.

■ 2. Appellant argues with force and quite correctly that taxation of iron ore is treated differently from taxation of other minerals. The question, however, is whether such unique treatment denies mining companies equal protection of the laws as an improper classification, or violates the requirement of uniformity.

As we have noted, iron ore property is leased but seldom sold. Ore deposits are difficult to measure. Overruns of deposits actually mined, that is to say, tonnage in fact realized compared to prior estimates, are common. Experience has demonstrated that as a result substantial tax losses have occurred over the years. If other industries devoted to mining different metals, or quarrying marble, granite, limestone, sand, or gravel, have similar problems they have not been called to our attention. Were it so, it seems likely the legislature would

have by now addressed them in some appropriate manner.

In finding the classification a proper one we apply principles we have stressed for many years. *County of Redwood v. Winona & St. Peter Land Co.*, 40 Minn. 512, 41 N.W. 465 (1889) was a case dealing with taxation of property which had escaped proper assessment for about 17 years. There, it was a matter of the county auditor being unaware that the property's exemption had been lost. Under the omitted property laws of 1881, Mr. Justice Mitchell writing for the court, in response to the claim that omitted property can't be the basis for current taxation stated:

The grand fallacy in this argument is in asuming that statutes like the one under consideration are acts authorizing *original* taxation. The tax was a debt or liability which the land owed in the year when it ought to have been assessed. Such statues are purely remedial in their nature, and only go to confirm pre-existing rights by adding to the means of enforcing existing obligations. And it can hardly be necessary at this day to argue that wherever property has escaped payment of its share of the public burdens it is competent for the legislature to provide for its assessment or reassessment for back years, and for that purpose it may adopt any method which it might have originally adopted for the enforcement of the collection of taxes.

*Id.* at 516, (not reported in full in N.W. Rptr.).

Several recent cases deserve comment. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Contos v. Herbst*, 278 N.W.2d 732 (Minn.) *appeal dismissed sub. nom. Prest v. Herbst*, 444 U.S. 804, 100 S.Ct. 24, 62 L.Ed.2d 17 (1979); *Miller Brewing Co. v. State*, 284 N.W.2d 353 (1979); and *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 (Minn.1980).

*San Antonio* dealt with disparity in the quality of schools, depending on the affluence or lack of it in the district which constituted a particular tax base. To meet equal protection criteria, the court held, the state's system need only bear some rational relationship to legitimate state purposes. The court went on to express this admonition.

"The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. * * [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. * * * It has * * * been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. * * * " *Madden v. Kentucky*, 309 U.S. 83, 87–88 [60 S.Ct. 406, 407–408, 84 L.Ed. 590] (1940) [footnotes omitted].

\*        \*        \*        \*        \*        \*

No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause. 411 U.S. at 40–41, 93 S.Ct. at 1300–01, 36 L.Ed.2d at 47–48 (footnote omitted).

Our decision in *Contos* is particularly relevant. There we upheld the taxation of mineral rights which were severed from the remainder of the fee. We quoted with approval:

Experience has shown that it is very difficult, if not impossible, to fairly and successfully tax this kind of property under the system ordinarily applied to personal property. This practical difficulty alone furnishes a basis for a classification, and

justifies the legislature in devising a special method for the taxation of the subjects of that class.

278 N.W.2d at 738–39 (quoting *Mutual Benefit Ins. Co. v. County of Martin*, 104 Minn. 179, 182, 116 N.W. 572, 574 (1908)). The problem in *Contos* as it is here was the fact that "a class of valuable property interests was escaping taxation because of the practicable difficulties in identifying, valuing, and assessing those interests within more traditional tax schemes." Due process, we said, demands only that the act promotes a public purpose; is not unreasonable, arbitrary or capricious interference; and the means bear a rational relation to the public purpose.

*Miller Brewing* upheld a tax which distinguished between brew produced in the state from brew produced elsewhere. The test we there adopted was stated thus:

The test to determine the constitutionality of statutory classifications includes three primary elements: (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

284 N.W.2d at 356.

In *Guilliams*, which dealt with a statute limiting tax deductions for farm losses, we stressed the principle that in the field of taxation "the legislature's power is inherently broader, and its exercise more flexible than in other areas." 299 N.W.2d at 142. We went on to note that a classification is not invalid because it isn't made with mathematical nicety and results in some inequality. *Id.* at 143. More significantly we added: "A statute is not constitutionally defective because it might have gone further

than it actually did." *Id.* We believe that doctrine applies to this statute which might have included mining operations other than iron ore, but did not. The failure to do so does not, in our opinion, invalidate Minn. Stat. § 273.02, subd. 4.

■ 3. Appellant would limit the retroactive effect of the 1975 drilling to one year as "undervalued" property rather than "omitted" property, under Minn.Stat. § 273.02, subd. 2 (1980). That statute provides as follows:

*Limitation.* Nothing in subdivision 1 to 3 shall authorize the county auditor to enter omitted property on the assessment and tax books more than six years after the assessment date of the year in which the property was originally assessed or should have been assessed and nothing in subdivisions 1 to 3 shall authorize the county auditor to correct the valuation or classification of real property as herein provided more than one year after December 1 of the year in which the property was assessed or should have been assessed.

It is argued by appellant that since a tax was actually imposed on real estate which was on the assessment rolls each year it cannot be regarded as "omitted", but was simply "undervalued." This position would be plausible were the tax on land which had no particular sub-surface value, and its contours and physical characteristics were visible to the eye. With respect to iron ore and other minerals, however, it is their existence or non-existence to which the statute is directed. In other words, in the case before us, 62,547 tons were not just taxed and undervalued, but were entirely omitted from taxation. It is the ore which was omitted, not the land. Consequently the six-year statute of limitations is applicable.

■ 4. The trial court held that distribution to the Iron Range Resources and Rehabilitation Board of taxes on omitted iron ore violated article X, § 1 of the Minnesota Constitution, but found that section to be severable. Minn.Stat. § 273.02, subd. 6 (1980). The court directed the tax pro-

ceeds to be distributed instead to the counties where the ore was mined, in this case, Itasca County, to be disbursed by the county to the various taxing authorities as other real estate taxes are disbursed.

The distribution of funds made available to the IRRRB by legislative appropriations and from iron ore taxation is governed by Minn.Stat. § 298.22, subd. 1(3) as follows:

When the commissioner shall determine that distress and unemployment exists or may exist in the future in any county by reason of the removal of natural resources or a possibly limited use thereof in the future and the decrease in employment resulting therefrom, now or hereafter, he may use such amounts of the appropriation made to him in section 298.-28, subdivision 1 as he may determine to be necessary and proper in the development of the remaining resources of said county and in the vocational training and rehabilitation of its residents.

The appellant, U.S. Steel, and respondent, County of Itasca, argue that the Uniformity Clause requires uniformity of distribution, and the proceeds of an ad valorem tax must benefit only the taxing districts where the taxed property is located. To do otherwise would unconstitutionally divert tax funds from their application to local obligations, it is suggested.

The State in its cross appeal points out that more than 95% of the IRRRB's funding is from occupation and severance taxes imposed by Minn.Stat. § 298.28, subd. 1(7) and (10)(b). Furthermore, so the State argues, in the present state of the economy on the Iron Range, Itasca and other counties are or "may soon be prime areas for IRRRB assistance." In response, U.S. Steel contends, with some validity, that if the distribution is improper, its size is not a relevant consideration. However, the fact that Itasca County is a likely candidate for relief from "distress and unemployment" is quite a different matter.

The principle thrust of the IRRRB Act is directed at mining areas where the removal of natural resources contributes to decreased employment and distressed econo-

my. Which mining operations will be curtailed or shut down and for what periods of time are unpredictable. A number of iron ore producing counties and municipalities are equally vulnerable, after enjoying equal benefits for decades of successful operation. To say that Itasca County is unconstitutionally deprived of benefits because taxes realized from its mines can be used not only to meet its obligations and relieve its distress, but to relieve the distress of other areas similarly situated, is to ignore the proliferating interdependence of one community with another in a highly structured economy. As all parties agree, the traditionally rigid standards governing what constitutes burdens and benefits have been considerably relaxed in this state and elsewhere in recent years.

In *Visina v. Freeman*, 252 Minn. 177, 89 N.W.2d 635 (1958), we were dealing with the question of whether areas beyond Duluth sufficiently benefited from the construction of a port facility in that city to justify imposing the burden of taxation elsewhere. What we said there applies with equal force to potential benefits which Itasca is required to share.

The portion of this constitutional provision which plaintiff contends is violated is that which reads: "Taxes shall be uniform upon the same class of subjects." The argument here is that the state is imposing a tax on portions of its people which derive no benefit from the improvement financed by such tax.

Absolute equality of taxation is never attained. In all segments of the population there are those who must pay taxes for a purpose from which, it might be argued, they derive no direct benefit. But absolute equality has never been required. If there is a reasonable relationship to the apportionment of the taxes and the benefit to be derived by that segment of our population required to bear the financial burden, it lies within the province of the legislature to make such apportionment.

*Id.* at 195, 89 N.W.2d at 650 (footnote omitted).

Subsequently in *Village of Burnsville v. Onischuk*, 301 Minn. 137, 149, 222 N.W.2d 523, 530 (1974) *appeal dismissed* 420 U.S. 916, 95 S.Ct. 1109, 43 L.Ed.2d 388 (1975), we expanded on what we deemed to be "a developing concept of the word 'benefit'."

[W]e are of the opinion that it is no longer necessary for units of government providing tax revenue to receive the kind of tangible and specific benefits to which our court has previously referred in order to satisfy the uniformity clause.

To the same effect are principles we discussed in *Lifteau v. Metropolitan Sports Facilities Commission*, 270 N.W.2d 749, 755, (Minn.1978) and *McCannell v. County of Hennepin*, 301 N.W.2d 910, 918–19 (Minn. 1980) where we reiterated that the legislature must be allowed to develop solutions to social problems free from undue restraints by the courts; that the courts will not disturb a legislative determination unless the classification is clearly arbitrary and has no reasonable basis; that states are not bound in tax matters to precise, scientific uniformity; and that "even improvident decisions will eventually be rectified by the democratic process", which is not to say that we consider the legislation under consideration in this case either unwise or improvident.

Accordingly we are of the opinion and hold that the distribution of taxes generated by omitted iron ore property is not in violation of article X, § 1 of the Minnesota Constitution. We reverse as to that portion of the trial court's decision. Otherwise the judgment of the trial court is in all respects affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

YETKA, Justice (concurring in part and dissenting in part).

I believe that Minn.Stat. § 273.02, subd. 4 (1980) violates the equal protection clause of the Fourteenth Amendment of the United States Constitution and the uniformity clause of Minn.Const. art. X, § 1. Accordingly, notwithstanding the majority's well-founded concern over encroaching upon the authority of the legislature, I respectfully dissent.

The majority opinion makes much use of the omitted property statute, Minn.Stat. § 273.02 (1980), the validity of which is undisputed. *Winona & St. Peter Land Co. v. Minnesota*, 159 U.S. 526, 16 S.Ct. 83, 40 L.Ed. 247 (1895). The error in the majority opinion is that this is not a case of omitted property at all, but one of undervalued property. Omitted property is property that has completely escaped taxation. Several cases where the court has addressed the question of what constitutes omitted property are instructive. In *County of Ramsey v. Chicago, M. & St. P. Ry. Co.*, 33 Minn. 537, 24 N.W. 313 (1885), a railroad claimed that lands it owned were exempted from taxation by state statute. The court held that the land was not exempt and that accrued taxes should be assessed under the omitted property provision then in effect, Gen.Stat. ch. 11, § 113 (1878), *amended by* Gen.L. 1881, ch. 5. Similarly, in *Chun King Sales, Inc. v. County of St. Louis*, 256 Minn. 375, 98 N.W.2d 194 (1959), the appellant argued that real estate it leased from the state was not subject to taxation. The court held that, because of the terms of the lease, the property was taxable as if owned by the appellant and the taxes owed would be assessed under Minn.Stat. § 273.02. *Accord, B. W. & Leo Harris Co. v. Dakota County*, 246 Minn. 20, 74 N.W.2d 111 (1955) (property held omitted within the meaning of Minn.Stat. § 273.02 where it belonged to corporation but was erroneously listed as belonging to city and thereby exempt); *County of Redwood v. Winona & St. Peter Land Co.*, 40 Minn. 512, 42 N.W. 473 (1889) (property escaped assessment for 17 years where county auditor unaware its exemption had been lost).

By contrast, this court has held that, where a building on a parcel of land was not included in the assessment on that land, what occurred was not an omission, but an undervaluation. *Davidson v. Franklin Avenue Investment Co.*, 129 Minn. 87, 151 N.W. 537 (1915). Considering the omitted property statute, Gen.Stat. § 1980 (1913), the court wrote:

Plainly this statute gives no power to reassess except where property is "omitted in the assessment of any year or years," and "thereby escape [sic] taxation." The real property in the present case was not "omitted" in the assessment of any year or years, and did not "escape taxation." It was assessed and taxed each year, but was undervalued, the "improvement" not being noted. This building was a part of the realty. The law does not provide for assessing the land and improvements thereon separately. It cannot be said that the improvement was not taxed, as the assessments were upon the real estate, including both the land and the building. In other words this is not a case of "omitting" property in an assessment, but simply of undervaluing it.

129 Minn. at 89, 151 N.W. at 538.

Just as land and improvements are not to be assessed separately; in the present case, the majority states that the value of the iron ore is an integral part of the value of the property and is not to be considered separately. At 324 N.W.2d at 640. Here, the appellant, the State of Minnesota, and the County of Itasca all knew there was iron ore on this property. The only real question was the value of the unmined ore. This is not a situation where some element which, in the past has been totally excluded, is now added to the assessed burden of a taxpayer. It is not the reclassification of previously exempted property, for instance, or—to use an example provided by the majority—the inadvertent discovery of gold under a shopping area. At 324 N.W.2d at 641. Rather, the task is one of estimating the volume and purity of vast amounts of yet unremoved ore, estimates which, by their very nature, must be inexact.

So far, the determination of amounts of ore has been left to the mining companies themselves. It is neither surprising nor blameworthy that these companies should be conservative in their estimates. Often,

there are "overruns," where the quantity of ore actually extracted exceeds the original estimates. The state could have responded to this situation by itself taking a more active role in determining the size of ore reserves. Instead, it enacted legislation which recharacterized what is really undervaluation as omission in order to impose a heavier tax liability on iron mining companies.

If any doubt remains that the problem really is one of undervaluation, one need only consider the following. In determining the value of an ore reserve, the market price per unit of volume is every bit as important as the total size of the deposit. If, for some reason, ore prices were suddenly to increase, no one would say that in previous years there had been an omission. Even if a mining company deliberately used a low estimate of market price, the result would be undervalued, rather than omitted, property.[1] Of course, this analysis would be meaningless if the issue were whether *any* iron ore existed under the company's property; *viz.*, if there were a true question of omitted property. That is not this case.

Not only does Minn.Stat. § 273.102, subd. 4 (1980) violate the equal protection and uniformity clauses by impermissibly distinguishing between owners of iron ore and other holders of undervalued property, it also unfairly differentiates between iron mining and other forms of ore and mineral production. The majority focuses on the problems inherent in valuing iron ore. The same problems, the same risk of "overrun," exist in other mining or quarrying industries, yet, iron ore alone is singled out in the omitted property statute. This hardly conforms to the constitutional mandate of uniform taxation upon the same class of subjects.

That at least the various ore-producing industries comprise such a class is implicitly recognized in our state constitution. Minn. Const. art. X, § 3 requires that "[e]very person engaged in the business of mining or

---

1. It is possible that property might be so "grossly undervalued" as to constitute an omission. *See Davidson v. Franklin Avenue Invest-* *ment Co.*, 129 Minn. 87, 90, 151 N.W. 537, 539 (1915). There is no indication that this is so in the present case.

producing iron ore or other ores in this state shall pay to the state an occupation tax on the valuation of all ores mined or produced." No one argues that all mining industries must be taxed identically in all respects. In *Lyons v. Spaeth*, 220 Minn. 563, 20 N.W.2d 481 (1945), this court held that article X, section 3 permitted different rates of taxation on different grades of ore and that such differing rates did not violate either the equal protection clause or the uniformity clause.

Nevertheless, *Lyons* dealt merely with a difference in the rate of taxation. Here, we have a difference in the manner of taxation. Although faced with the same problems of valuation as any other extractive industry, under Minn.Stat. § 273.02, iron ore producers are faced with the possibility of revised tax assessments for 6 previous years while other mineral and ore producers face such revisions for only 1 year.

The legislature has great power and flexibility in the area of taxation, *see Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 (Minn.1980), but the exercise of that power must not infringe upon the constitutional rights of our citizens. Nor is an otherwise unconstitutional statute acceptable because the burden it imposes is a small one. Minn.Stat. § 273.02, subd. 4 (1980) treats the producers of iron ore differently from other holders of undervalued property and from other mineral and ore producers. It is unconstitutional under the equal protection clause of the Fourteenth Amendment of the United States Constitution and the uniformity clause of article X, section 1 of the Minnesota Constitution.

I have noted an ominous trend in recent acts by the legislature which appear to reflect the goal of basing the taxation of real estate on the ability to pay. So many classifications of property now exist as to cause many inequalities in the tax. The real estate tax was never intended to be a tax on ability to pay, but rather an *ad valorem* tax, a tax on value. Even the United States government required a constitutional amendment to impose an income tax; yet, the legislature in Minnesota seems to reach the same result with the real estate tax absent a constitutional amendment. We all must remember that our constitutions—both state and federal—were intended to protect not only one citizen from another, but also to protect all citizens from oppressive acts of the government. If the legislature can strike an illegal blow at the mighty and be permitted to get away with it, it can more easily strike again at those least able to respond. I think there is a point at which to call a halt to such activity, and this is a good opportunity.

I concur in that portion of the majority opinion dealing with the distribution of the proceeds of the tax.

PETERSON, Justice (dissenting).

I join in Justice Yetka's opinion that Minn.Stat. § 273.02, subd. 4 (1980), violates the equal protection clause of the fourteenth amendment of the United States Constitution and the uniformity clause of Minn.Const. art. X, § 1. I would accordingly not reach the issues relating to the distribution of the revenues derived from such tax.