Jeffrey T. WALKER, individually and as Mayor of Cohasset, et al., Petitioners, Appellants,

v.

Itasca County Auditor Robert ZUEHLKE, et al., Respondents.

No. C9–00–1863.

Supreme Court of Minnesota.

May 2, 2002.

---

1. There are 87 counties, 854 cities, and 1,792 townships in Minnesota.

Phillip R. Krass, Krass Monroe, P.A., Bloomington, Appellants' Attorney(s).

Mike Hatch, Attorney General, Bradford S. Delapena, James W. Neher, Asst. Attorneys General, St. Paul, Respondents' Attorney(s).

## OPINION

LANCASTER, Justice.

The issue before us is whether Minn. Stat. ch. 276A (1998), commonly referred to as the Range Fiscal Disparities Act (RFDA), violates the Uniformity Clause of the Minnesota Constitution, Minn. Const. art. X, § 1. The district court held the RFDA violates the Uniformity Clause, finding no reasonable relationship between the benefits and burdens of the RFDA. The court of appeals reversed. *Walker v. Itasca County Auditor*, 624 N.W.2d 599, 603 (Minn.App.2001). We affirm.

Appellant Jeffrey Walker resides in and is the mayor of Cohasset, Minnesota. He is also a general partner in appellant J.R. Properties. J.R. Properties owns commercial property in Grand Rapids, Minnesota. Both appellants pay taxes on their respective properties. On September 14, 1998, appellants filed suit against the State of Minnesota to challenge the constitutionality of the RFDA.[1]

We begin with a review of relevant legislation affecting northeast Minnesota, known informally as the "Iron Range," to place the RFDA in context. For more than 60 years, the legislature has recognized the potential for economic hardship in northeast Minnesota due to the region's dependence on the mining industry. In 1941, the Office of Commissioner of Iron Range Resources and Rehabilitation was established to alleviate "distress and unemployment * * * by reason of the removal of natural resources and the decrease in employment resulting therefrom." Act of Apr. 28, 1941, ch. 544, § 4, 1941 Minn. Laws 1077, 1078–79 (codified as amended

at Minn.Stat. § 298.22, subd. 1 (2000)); *see* Act of June 2, 1977, ch. 423, art. 10, §§ 25–28, 1977 Minn. Laws 1009, 1079 (codified as amended at Minn.Stat. §§ 298.291–.294 (1998)) (establishing northeast Minnesota economic protection fund).

Also in 1941, the legislature enacted a tax on taconite production in lieu of local property taxes. Act of Apr. 22, 1941, ch. 375, §§ 2–3, 1941 Minn. Laws 692, 692–93 (codified as amended at Minn.Stat. §§ 298.24–.25 (1998)). Originally, the municipalities, counties, and school districts from which the taconite was taken shared the tax proceeds with the state. Minn. Stat. § 298.28 (1941). The legislature has since allocated the tax proceeds to several more funds and organizations. We summarize them, in relevant part, below.

Several changes to the allocation of the taconite production tax depend on an area known as the Taconite Tax Relief Area (TTRA), which the legislature created more than 30 years ago. Act of May 31, 1969, ch. 1156, § 4, 1969 Minn. Laws 2645, 2648–49 (codified as amended at Minn. Stat. § 273.134 (1998)). The TTRA includes the area within the boundaries of a school district that contains a municipality "in which the assessed valuation of unmined iron ore on May 1, 1941, was not less than 40 percent of the assessed valuation of all real property" or "in which, on January 1, 1977 or the applicable assessment date, there is a taconite concentrating plant or where taconite is mined or quarried or where there is located an electric generating plant which qualifies as a taconite facility." Minn.Stat. § 273.134. The TTRA includes all or parts of Cook,

1. On November 9, 1998, appellants filed an amended complaint. The amended complaint differed from the original complaint by adding the auditors of Itasca, St. Louis, Aitkin, Cook, Lake, and Crow Wing Counties as defendants.

The City of Cohasset also joined the complaints as a plaintiff, but was dismissed for lack of standing.

Lake, St. Louis, Itasca, Aitkin, Crow Wing, and Koochiching Counties.

At the same time as the TTRA's creation, the legislature allocated part of the taconite production tax proceeds to the taconite property tax relief account. Act of May 31, 1969, ch. 1156, § 2, 1969 Minn. Laws 2645, 2646–48 (codified as amended at Minn.Stat. § 298.28, subd. 6 (1998)). Homestead property within the TTRA is subject to a reduced tax. Minn.Stat. § 273.135, subds. 1–2 (1998). The taconite property tax relief account replaces revenues lost because of the reduction of homestead property taxes. Minn.Stat. § 273.136, subds. 1–2 (1998).

In 1977, the legislature assigned a portion of the taconite production tax to the taconite municipal aid account, the Iron Range Resources and Rehabilitation Board (IRRRB), the taconite environmental protection fund, and the northeast Minnesota economic protection fund. Act of June 2, 1977, ch. 423, art. 10, § 16, 1977 Minn. Laws 1009, 1073–76. The taconite municipal aid account is distributed to municipalities within the TTRA. Minn.Stat. § 298.282, subd. 1 (1998). Funds allocated to the IRRRB from the taconite production tax must be used in or for the benefit of areas within the TTRA. Minn.Stat. § 298.28, subd. 7 (1998). The commissioner of the IRRRB may use the funds to develop a county's remaining resources and train its residents upon a determination that distress and unemployment exist or may exist by reason of the removal or possibly limited use of natural resources. Minn.Stat. § 298.22, subd. 1(3). The taconite environmental protection fund exists to reclaim, restore, and enhance areas within the TTRA "that are adversely affected by the environmentally damaging operations involved in mining taconite and iron ore and producing iron ore concentrate and for the purpose of promoting the economic development of northeast Minnesota." Minn.Stat. § 298.223, subd. 1 (1998). Funds allocated to the northeast Minnesota economic protection trust fund from the taconite production tax may only be used in or for the benefit of the TTRA. Minn.Stat. § 298.292, subd. 2 (1998). The fund is devoted to economic rehabilitation and diversification of areas adversely affected by the decline of an industry on which the area is dependent. *Id.*, subd. 1.

In 1978, the legislature added the range association of municipalities and schools to the list of recipients of the taconite production tax. Act of Mar. 31, 1978, ch. 721, art. 9, § 3, 1978 Minn. Laws 734, 751–55 (codified as amended at Minn.Stat. § 298.28, subd. 8 (2000)). Funds are allocated to the association from the taconite production tax

for the purpose of providing an areawide approach to problems which demand coordinated and cooperative actions and which are common to those areas of northeast Minnesota affected by operations involved in mining iron ore and taconite and producing concentrate therefrom, and for the purpose of promoting the general welfare and economic development of the cities, towns, and school districts within the iron range area of northeast Minnesota.

Minn.Stat. § 298.28, subd. 8.

As of late 1999, St. Louis County held approximately 90% of the present total effective capacity of Minnesota's taconite industry and Itasca County held approximately 10%. Currently, the recipients of the taconite production tax include: (1) TTRA municipalities, *id.*, subds. 2–3; (2) TTRA school districts, *id.*, subd. 4; (3) counties where taconite is mined, quarried, or concentrated, *id.*, subd. 5; (4) the taconite property tax relief fund, *id.*, subd. 6; (5) the IRRRB, *id.*, subd. 7; (6) the range association of municipalities and schools,

*id.*, subd. 8; (7) the northeast Minnesota economic protection trust fund, *id.*, subd. 9; (8) the taconite economic development fund, *id.*, subd. 9a; and (9) the taconite environmental fund, *id.*, subd. 9b.

The legislature enacted the RFDA in 1996. Act of Apr. 12, 1996, ch. 471, art. 11, §§ 3–11, 1996 Minn. Laws 1717, 1865–72 (codified as amended at Minn.Stat. ch. 276A). The RFDA is similar to Minn.Stat. ch. 473F (1998), commonly referred to as the Metropolitan Fiscal Disparities Act (MFDA), which was enacted more than 30 years ago. Act of July 23, 1971, ch. 24, §§ 1–13, 1971 Minn. Laws 2286. We upheld the constitutionality of the MFDA against a Uniformity Clause challenge in *Village of Burnsville v. Onischuk*, 301 Minn. 137, 222 N.W.2d 523 (1974).

The RFDA imposes a limited form of commercial-industrial tax base sharing within the TTRA. Each municipality within the TTRA that experiences growth in its commercial-industrial tax base after 1995 contributes 40% of that growth to a pool. Minn.Stat. §§ 276A.04–.05 (2000). The pool is allocated to each municipality according to an index calculated in direct relation to the municipality's population and in inverse relation to its fiscal capacity.[2] The tax base sharing imposed by the RFDA effectively redistributes tax revenues across the TTRA.[3]

Having discussed the relevant statutory provisions, we turn our attention to the proceedings below. After trial, the district court held that the RFDA violates the Uniformity Clause. The district court's analysis centered on our decision in *Onischuk*. The district court interpreted *Onischuk* "as recognizing that under the law at the time of that decision, the MFDA would have been unconstitutional but for the Supreme Court's decision to apply an expanded definition of the term 'benefit.'" The district court read *Onischuk* to expand the definition of "benefit" to one that includes "the benefits derived from living in a highly structured and interdependent commercial-industrial area."

The district court devoted a substantial portion of its Findings of Fact to distinctions between the Iron Range and the Twin Cities metropolitan area.[4] The distinctions led the district court to conclude that "[t]he reasons which gave rise to the MFDA simply do not apply in the TTRA. The MFDA clearly was passed to address and control issues that the two core cities had concerning the supplying of services, a job base, transportation, the environment, etc." The district court found that TTRA communities are not interdependent:

> [C]ommunities within the TTRA are not interdependent and * * * they share few, if any, reciprocal benefits. The evidence shows that expansion of commercial-industrial property in Lake or Cook counties does not confer *any* benefit on Aitkin or Itasca county, or vice-versa. For that matter, there is no evidence that such development imposes any burden on communities separated by such

---

2. A municipality's fiscal capacity is "its valuation, determined as of January 2 of any year, divided by its population, determined as of a date in the same year." Minn.Stat. § 276A.01, subd. 12 (2000). "Valuation" is "the market value of real and personal property within a municipality." *Id.*, subd. 11.

3. For a detailed explanation of how the MFDA and the RFDA operate, see Minnesota House of Representatives Research Department, *Minnesota's Fiscal Disparities Programs* (2000).

4. The district court found that the distinctions between the two regions include their geographic areas, populations, population densities, planning authorities, transportation systems, authority to regulate wastewater treatment, authority to regulate airports, and commuting patterns.

great distances. In this time of modern transportation and communications the Court recognizes that development and the creation of jobs anywhere within the TTRA has some positive impact on the region's overall economy. However, there is also some positive impact on the economy in the TTRA when there is commercial-industrial development and job creation in Duluth, Brainerd, or even the Twin Cities or Winona.

The district court reached a similar conclusion with respect to tax expenditures: "[J]ust as the evidence that development in one portion of the TTRA does not confer any benefit on other, especially distant, portions of the TTRA, the expenditure of tax dollars in one community does not benefit other, distant communities."

The district court rejected respondents' argument that the IRRRB and the distribution of the taconite production tax create interdependence within the TTRA. First, the district court characterized the distribution of the taconite production tax within the TTRA as a legislative creation that creates "a sort of pseudo-interdependence among communities that are otherwise fiercely independent." In contrast, the metro area's interdependence "grew without legislative interference." Second, the district court found that the proper consideration to determine the constitutionality of a tax is the relationship between the benefits derived from and the burdens imposed by the challenged tax. The district court also concluded that the burdens and the benefits of unrelated legislation are not appropriate to consider when determining the constitutionality of a tax.

The court of appeals reversed, concluding that the RFDA does not violate the Uniformity Clause. *Walker,* 624 N.W.2d at 603. The court of appeals found that the district court had "focused too narrowly upon the factual environment in *Onis-*

*chuk." Walker,* 624 N.W.2d at 602. Although it acknowledged that communities within the TTRA, unlike those in the Twin Cities metropolitan area, do not derive benefits from social and economic integration, the court of appeals concluded that TTRA communities derive substantial benefits from the distribution of the taconite production tax that justify the burdens imposed by the RFDA. *Id.* at 602–03.

The court of appeals rejected the district court's conclusion that the RFDA was "unrelated" to the distribution of the taconite production tax. *Walker,* 624 N.W.2d at 603. Instead, the court of appeals characterized the RFDA as "a natural outgrowth of the TTRA—the sharing of the taconite production tax revenue finances the economic development efforts that help produce the growth in the commercial-industrial property tax base." *Walker,* 624 N.W.2d at 603. It was also the court of appeals' view that we had already decided the issue: "[T]he Minnesota Supreme Court has already held that the benefits of sharing the taconite production tax may be used to support an extension, in separate legislation, of revenue sharing within the TTRA." *Id.* (citing *In re United States Steel Corp.,* 324 N.W.2d 638, 645 (Minn. 1982)).

The constitutionality of a statute is a question of law subject to de novo review. *Westling v. County of Mille Lacs,* 581 N.W.2d 815, 819 (Minn.1998). We presume that statutes are constitutional. *Scott v. Minneapolis Police Relief Ass'n,* 615 N.W.2d 66, 73 (Minn.2000); *In re Welfare of D.L.,* 486 N.W.2d 375, 379 (Minn. 1992). Therefore, "we exercise our power to declare a statute unconstitutional with extreme caution and only when absolutely necessary." *Boutin v. LaFleur,* 591 N.W.2d 711, 714 (Minn.1999). A party challenging a statute's constitutionality must establish beyond a reasonable doubt

that the statute is unconstitutional. *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 299 (Minn.2000); *McGuire v. C & L Rest. Inc.*, 346 N.W.2d 605, 611 (Minn.1984).

■ We review the RFDA, like all tax legislation, with great deference to the legislature: "Because taxation policy is peculiarly a legislative function, involving political give-and-take and an awareness of local conditions, the courts are very deferential in their review of tax legislation." *Metro. Sports Facilities Comm'n v. County of Hennepin*, 478 N.W.2d 487, 489 (Minn. 1991). We find the United States Supreme Court's explanation of the reasons for judicial deference to the legislative branch with respect to tax policy particularly instructive:

"The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized.... [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies.... It has ... been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes...."

\* \* \* No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40–41, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (quoting *Madden v. Kentucky*, 309 U.S. 83, 87–88, 60 S.Ct. 406, 84 L.Ed. 590 (1940)) (citations omitted).

■ The Uniformity Clause of the Minnesota Constitution provides that "[t]axes shall be uniform upon the same class of subjects." Minn. Const. art. X, § 1. In 1906, the people of Minnesota amended the constitution to adopt the Uniformity Clause.[5] The purpose of the amendment was "to relieve the legislature of the rather narrow restrictions theretofore placed upon that branch of the government by the constitution and to enlarge its powers in regard to taxation." *Reed v. Bjornson*, 191 Minn. 254, 258, 253 N.W. 102, 104 (1934). "The fair adjustment of tax burdens under rapidly changing social conditions demanded more comprehensive powers in the legislature; and the people, relying upon the responsibility of that body to its constituents, relaxed the restraints theretofore existing." *Id.* at 259, 253 N.W. at 104.

■ The Uniformity Clause does not require absolute equality of taxation; it requires only that a reasonable relationship exist between the burdens and benefits of a tax:

Absolute equality of taxation is never attained. In all segments of the popula-

---

**5.** Before the 1906 amendment, the constitution stated: "All Taxes to be raised in this State shall be as nearly equal as may be, and all property on which Taxes are to be levied shall have a cash valuation, and be equalized and uniform throughout the State." Minn. Const. of 1857, art. IX, § 1.

tion there are those who must pay taxes for a purpose from which, it might be argued, they derive no direct benefit. But absolute equality has never been required. If there is a reasonable relationship to the apportionment of the taxes and the benefit to be derived by that segment of our population required to bear the financial burden, it lies within the province of the legislature to make such apportionment.

*Visina v. Freeman,* 252 Minn. 177, 195, 89 N.W.2d 635, 650 (1958). Thus, the issue before us is whether those units of government within the TTRA that contribute more of their tax base to the pool than is redistributed to them in a given year receive sufficient benefits to satisfy the constitutional requirement of uniformity.

We begin our analysis with *Onischuk* because there we analyzed the constitutionality of the MFDA, which is the statutory foundation of the RFDA. The parties offer conflicting interpretations of *Onischuk.* Appellants maintain that *Onischuk* "carved out a limited exception" to the Uniformity Clause for metropolitan areas. Respondents contend that *Onischuk* "simply applied general uniformity principles to the particular facts before it."

In *Onischuk,* we acknowledged that a literal reading of our prior opinions indicated that the MFDA violated the Uniformity Clause. *Onischuk,* 301 Minn. at 149, 222 N.W.2d at 530. Our decision to uphold the constitutionality of the MFDA "hinge[d] on what we deem[ed] to be a developing concept of the meaning of the word 'benefit.'" *Onischuk,* 301 Minn. at 149, 222 N.W.2d at 530. We stated that "[i]n a seven-county area which is heavily populated, * * * it is no longer necessary for units of government providing tax revenues to receive the kind of tangible and specific benefits to which our court has previously referred in order to satisfy the

uniformity clause." *Onischuk,* 301 Minn. at 149, 222 N.W.2d at 530. We recognized the "high degree of mobility and political, social, and economic interdependence" within the Twin Cities metropolitan area. *Id.* at 152, 222 N.W.2d at 532. We acknowledged the theory underlying the MFDA is that "the residents of highly developed commercial-industrial areas *do* enjoy direct benefits from the existence of adjacent municipalities which provide open spaces, lakes, parks, golf courses, zoos, fairgrounds, low-density housing areas, churches, schools, and hospitals." *Onischuk,* 301 Minn. at 153, 222 N.W.2d at 532. We concluded that the MFDA satisfied the Uniformity Clause. *Onischuk,* 301 Minn. at 153–54, 222 N.W.2d at 532–33.

Appellants argue, as already noted, that *Onischuk* created a "metropolitan area" exception to the Uniformity Clause; however our decision in that case turned on the developing concept of the term "benefit." The distinctions between the TTRA and the Twin Cities metropolitan area, therefore, do not persuade us that the RFDA violates the Uniformity Clause.

We have already upheld tax revenue sharing within the Iron Range. In *United States Steel,* we held that the distribution to the IRRRB of taxes on omitted iron ore did not violate the Uniformity Clause. *United States Steel,* 324 N.W.2d at 645. In that case, Itasca County and U.S. Steel argued that "the proceeds of an ad valorem tax must benefit only the taxing districts where the taxed property is located." *Id.* at 644. We rejected this argument because Itasca County was a likely candidate for IRRRB assistance:

The principle thrust of the IRRRB Act is directed at mining areas where the removal of natural resources contributes to decreased employment and distressed economy. Which mining operations will be curtailed or shut down

and for what periods of time are unpredictable. A number of iron ore producing counties and municipalities are equally vulnerable, after enjoying equal benefits for decades of successful operation. To say that Itasca County is unconstitutionally deprived of benefits because taxes realized from its mines can be used not only to meet its obligations and relieve its distress, but to relieve the distress of other areas similarly situated, is to ignore the proliferating interdependence of one community with another in a highly structured economy.

*United States Steel,* 324 N.W.2d at 644.

In addition, as we observed almost 20 years ago, "the traditionally rigid standards governing what constitutes burdens and benefits have been considerably relaxed in this state." *Id.* Although the present effective capacity of Minnesota's taconite industry is now found only in St. Louis and Itasca Counties, all communities within the TTRA continue to enjoy benefits from the taconite production tax. The distribution replaces lost revenue because of homestead property tax relief within the TTRA. Municipalities, school districts, and counties within the TTRA receive a portion of the tax. Recognizing the potential for economic hardship because of the region's dependence on a single industry, the legislature established several organizations and funds to rehabilitate areas adversely affected by the mining industry, to foster economic growth, and to diversify the region's economy, and allocated part of the taconite production tax to these organizations and funds. Where the taconite production tax has been distributed among the communities of the TTRA and that revenue sharing has spurred more commercial-industrial growth in some communities than in others, it is reasonable for the legislature to direct that a portion of the increase in commercial-industrial property tax base generated by that growth be

shared among the communities within the TTRA. We hold, therefore, that the RFDA does not violate the Uniformity Clause.

Affirmed.