**ERIE MINING COMPANY,**
**Respondent-Petitioner,**

v.

**COMMISSIONER OF REVENUE,**
**Petitioner-Respondent.**

Nos. C4–83–193, CX–83–196.

Supreme Court of Minnesota.

Jan. 6, 1984.

Rehearing Denied Feb. 29, 1984.

John W. Windhorst, Jr., Bruce J. Shnider, Dorsey & Whitney, Minneapolis, for respondent-petitioner.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for petitioner-respondent.

Laurence J. Klun, Ely, amicus curiae for Range Ass'n of Municipalities and Schools.

TODD, Justice.

Taconite ore was originally taxed in Minnesota based on annual production. The tax on production is "in lieu" of other taxes, including property taxes that could be imposed on taconite producers. *See* Minn. Stat. § 298.25 (1982). In 1977 the Minnesota legislature amended Minn.Stat. § 298.24 to compute the "in lieu" tax in one of two ways. The tax is now the greater of the annual taconite production or the average of the last three years of production. The tax court held the averaging method was permissible, but declared unconstitutional the annual production method when alternated with the averaging method, since it allegedly resulted in double taxation violating the uniformity clause of the Minnesota Constitution and the equal protection and due process clauses of the United States

Constitution. We find the taxing statute to be constitutional in all respects.

The parties have stipulated to the facts in this case. We have utilized the salient facts necessary to our decision. In 1977, 1978 and 1980, Erie Mining's tax liability was determined by the averaging formula which for those years produced a higher tax than the annual taconite production method. In 1979, the annual production method resulted in a higher figure than the averaging method and it was used to determine the tax liability. Erie Mining accepts the independent use of the three-year averaging method or the annual production method proposed by Minn.Stat. § 298.24, subd. 1 (1982) and approved by the court in the years 1979–80.[1] Erie believes either method used alone is constitutional. It is when the averaging method and the annual production are used together, that double taxation results. Erie claims that the excess annual production over the three-year average is taxed twice. In other words, the amount of current production in excess of the average is taxed in the previous year and again in the succeeding year when it is used in the averaging method.

Erie's argument is better explained with the use of figures. Erie argues that alternating computational methods results in duplicative taxation. It asserts that the amount of production in the current year that exceeds the average production for the three-year period is doubly taxed. For example, in Erie's case, the approximate production used for taxation in 1978 was 7.6 million tons, in 1979 9.8 million tons, in 1980 5.9 million tons. The average for 1978–80 was 7.8 million tons. The average of 7.8 was higher than the 5.9 million tons of actual production that Erie had in 1980 and the 7.6 million tons produced in 1978 so the average was used in those years to tax Erie. The problem is that in 1979 current production, which amounted to 9.8 million tons, was used to tax Erie. To determine what Erie believed it should have paid, the excess 1979 production over the 1978–80 average must be computed.

Production in 1979 was 9.8 million tons and from that figure subtract the average production for those years of 7.8 million tons. That leaves 2.0 million tons that are allegedly taxed twice by alternating the average production method with the annual production method in taxing taconite. To avoid taxing the 2.0 million tons twice, either the averaging method would have to be used exclusively in all years or, alternatively, the annual year's production in all years. Switching back and forth creates this purported overlap in taxing excess production over the three-year average twice.

The tax court held that the averaging method of valuation was constitutional, but that alternating that method with the annual production method violated the equal protection clause of the United States Constitution, amend. XIV, § 1 and the uniformity clause of the Minnesota Constitution, art. 10, § 1. It found that using the averaging method exclusively in tax years 1977, 1978 and 1980 did not violate those constitutional provisions. The tax court also found that Minn.Stat. § 298.24 violated the due process clauses of the United States Constitution, amend. XIV, § 1 and the Minnesota Constitution, art. 1, § 7.

The first issue on appeal is whether the tax court has subject matter jurisdiction over the constitutional issues in this case. The second issue on appeal is whether the statutory scheme alternating the annual production method with the three-year average method is unconstitutional under the uniformity or equal protection clauses. The third issue on appeal is whether the use of tax years 1975 and 1976 to compute taxes in 1977 and 1978 violates the due process clause. Finally, this court must

---

1. But Erie objects to utilizing tax years 1975 and 1976 to compute tax liability, based on the averaging method, for tax years 1977 and 1978. Erie argues that those tax years are previous to the enactment of the amended Minn.Stat. § 298.24 in 1977 in which the alternating three-year averaging method was introduced. Erie maintains that since it includes tax years previous to the amendment, it fails to give taxpayers adequate notice of how the tax is computed and, therefore, violates due process.

decide if the Commissioner of Revenue's application of the iron-content adjustment of Minn.Stat. § 298.24, subd. 1(b) and the price index adjustment in subd. 1(a) is correct.

The appeals for the year 1977 (Docket No. 2630), 1978 (Docket No. 2822), and 1979 (Docket No. 3107) were filed with the tax court prior to our decisions in *Matter of McCannel*, 301 N.W.2d 910 (Minn. Sept. 5, 1980) and *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 (Minn. Oct. 24, 1980). An appeal for the tax year 1980 was filed after these decisions, but the tax court consolidated the appeals for 1977–1980. The tax court held that it had subject matter jurisdiction. Subsequent to these decisions the Commissioner of Revenue first challenged the jurisdiction of the tax court to decide constitutional issues.

■■■ 1. Consistent with the position we adopted in *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 (Minn.1980) we hold that the tax court in this case had subject matter jurisdiction since the appeals were filed prior to our decision in *Guilliams*. We reject any attempt to modify the rule adopted in *Matter of McCannel*, 301 N.W.2d 910 (Minn.1980), where we held that the tax court had no original jurisdiction to decide constitutional issues. The tax court has no jurisdiction to hear constitutional matters in tax cases filed after the *Guilliams* decision was rendered.

We perceive no difficulty in enforcing this rule. All tax matters over which the tax court has jurisdiction should be filed with the tax court. If any party raises a constitutional issue, the tax court should stay the proceedings and refer the constitutional question to the district court. The district court may either decide the constitutional issue or refer the matter back to the tax court which will then have subject matter jurisdiction to rule initially on the constitutional issue. If the tax court should declare any matter unconstitutional and no appeal is taken to this court, that ruling shall only be the law of the particular case involved.

2. We turn next to the constitutional challenges to Minn.Stat. § 298.24 (1982). The first constitutional challenge posited by Erie is that Minn.Stat. § 298.24 violates the uniformity clause of the Minnesota Constitution. The clause reads in relevant part: "[T]axes shall be uniform upon the same class of subjects * * *." Minn. Const. art. 10, § 1. The tax court found for Erie, holding the alternative annual production method unconstitutional when used in conjunction with the averaging method. This holding can be sustained only if the alternative tax is determined to be a tax on production itself and not a property tax. This court must decide whether the taconite tax is a tax on property or production. Considered as a production tax, the taconite tax doubly taxes production in peak production years. If the tax is considered a property tax, the use of production is merely a computational method chosen by the legislature to arrive at the value of property used for taconite production.

Historically, the taconite industry of Minnesota has received special tax considerations since its inception. Article 10, section 6 of the Minnesota Constitution provides in part: " * * * Taxes imposed on the mining or quarrying of taconite or semi-taconite and on the production of iron ore concentrates therefrom, which are in lieu of a tax on real or personal property, shall not be considered to be occupation, royalty, or excise taxes within the meaning of this amendment." The legislature fostered the growth of the industry by taxing it a special way. Minn.Stat. § 298.24 provides in part:

Subdivision 1. (a) There is hereby imposed upon taconite and iron sulphides, and upon the mining and quarrying thereof, and upon the production of iron ore concentrate therefrom, and upon the concentrate so produced, a tax of $1.25 per gross ton of merchantable iron ore concentrate as produced therefrom. The tax on concentrates produced in 1978 and subsequent years shall be equal to $1.25 multiplied by the steel mill products index during the production year, divided by the steel mill products index in 1977.

The index stated in code number 1013, or any subsequent equivalent, as published by the United States Department of Labor, Bureau of Labor Statistics Wholesale Prices and Price Indexes for the month of January of the year in which the concentrate is produced shall be the index used in calculating the tax imposed herein. In no event shall the tax be less than $1.25 per gross ton of merchantable iron ore concentrate.

(b) An additional tax is hereby imposed equal to 1.6 percent of the total tax imposed by clause (a) per gross ton for each one percent that the iron content of such product exceeds 62 percent, when dried at 212 degrees Fahrenheit.

(c) The tax imposed by this subdivision shall be computed on the production for the current year or the average of the production for the current year and the previous two years, whichever is higher. This clause shall not apply in the case of the closing of a taconite facility if the property taxes on the facility would be higher if this clause and section 298.25 were not applicable.

(d) If the tax or any part of the tax imposed by this subdivision is held to be unconstitutional, a tax of $1.25 per gross ton of merchantable iron ore concentrate produced shall be imposed.

Minn.Stat. § 298.24 (1982). Minn.Stat. § 298.25 adds to this, providing in part:

The taxes imposed under section 298.24 shall be in addition to the occupation tax imposed upon the business of mining and producing iron ore and in addition to the royalty tax imposed upon royalties received for permission to mine and produce iron ore. Except as herein otherwise provided, such taxes shall be *in lieu of all other taxes* upon such taconite and iron sulphides, or the lands in which they are contained, or upon the mining or quarrying thereof, or the production of concentrate therefrom, or upon the concentrate produced, or upon the machinery, equipment, tools, supplies and buildings used in such mining, quarrying or production, or upon the lands occupied by, or used in connection with, such mining, quarrying or production facilities. Minn.Stat. § 298.25 (1982) (emphasis added).

Under the constitutional and statutory methods of taxation used by the legislature, this case involves a tax which clearly is in lieu of all other real or personal property taxes, a fact which was conceded by counsel for Erie Mining during oral argument.

■ The Commissioner contends, and we agree, that the tax is not imposed on production itself, but that production is used as a means of computing the in lieu tax imposed by the statute. The taconite tax is a substituted method of taxation for the property tax. A portion of the production tax revenues is earmarked for those local governments and school districts that would normally receive property tax revenues from local taconite companies. *See* Minn.Stat. § 298.28 (1982). Taconite producers occupy a unique type of property and extract a valuable state natural resource from the ground. Since companies producing iron ore are not subject to property taxes, Minn.Stat. § 298.24, subd. (1)(c) was devised to supplant the loss of property tax revenue. This court has just recently recognized that "[t]aconite companies in Minnesota are * * * exempt from property taxes, section 298.25, on their taconite operations, *since the production taxes are in lieu of a property tax.*" *Pickands Mather & Co. v. Commissioner of Revenue,* 334 N.W.2d 155, 157 (Minn.1983) (emphasis added).

Our case law recognizes that while the true subject of the tax may be one thing, *i.e.* gross receipts or production, the tax still may be a property tax. For example, this court has found that the gross earnings tax on railroads is in lieu of a property tax and that it is simply a means of conveniently and efficiently computing the railroad's tax. *See Soo Line R. Co. v. Commissioner of Revenue,* 277 N.W.2d 7, 8–9 (Minn.1979); *State v. Minneapolis & St. Louis Railway Co.,* 257 Minn. 124, 130, 100 N.W.2d 669, 674 (1959). We recognized in

*Soo Line* that the gross earnings tax was not a true property tax. 277 N.W.2d at 9. The court acknowledged that this was a legal fiction, but upheld its use as a method of measuring the property tax. *Id.* at 9 n. 1. *See also accord, Railway Express Agency, Inc. v. Commissioner of Taxation,* 307 Minn. 245, 247 n. 2, 239 N.W.2d 245, 246 n. 2 (1976); *Reuben L. Anderson-Cherne, Inc. v. Commissioner of Taxation,* 303 Minn. 124, 129–30, 226 N.W.2d 611, 615 (1975) *appeal dismissed* 423 U.S. 886, 96 S.Ct. 181, 46 L.Ed.2d 118 (even though statute uses net income as a measure, it is still a franchise tax); *State v. United States Express Co.,* 114 Minn. 346, 131 N.W. 489, (1911), *aff'd* 223 U.S. 335, 32 S.Ct. 211, 56 L.Ed. 459 (1912). As stated by this court regarding the gross receipts tax:

> We have so frequently discussed the nature of these gross earnings taxes and the subject is so thoroughly covered in case No. 32720, *State of Minnesota v. Railway Express Agency, Inc., supra,* that it would be a work of supererogation again to go over that subject here. We must always bear in mind that the gross earnings tax is a tax upon property and that the earnings are merely the convenient yardstick or measure by which that property tax is determined. *It is just as much a property tax as if it were assessed ad valorem.*

*State v. Fawkes,* 210 Minn. 587, 588–89, 299 N.W. 666, 667 (1941) (emphasis added).

Under *Soo Line* and its predecessors the double taxation problem merely becomes definitional. The alternating method of taxation of Minn.Stat. § 298.24 is clearly a method used to compute the property tax liabilities of taconite producers. The "in lieu of" language suggests a substitution of the taconite tax for other normal taxes imposed on mining lands and personal property. The case law and legislative intent behind the statute support that conclusion. The fact that some companies may have a higher tax because of increased production or others a lower tax because of reduced production does not change the result. Any differences in amount of taxes paid will result from "differences in situation and not from differences in treatment." *Oliver Iron Mining Co. v. Lord,* 262 U.S. 172, 181, 43 S.Ct. 526, 530, 67 L.Ed. 929 (1923). *See Fox v. Standard Oil Co.,* 294 U.S. 87, 101, 55 S.Ct. 333, 339, 79 L.Ed. 780 (1935).

■ Having concluded that the alternate tax method adopted in Minn.Stat. § 298.24 is not a production tax, we need not consider the uniformity clause argument raised by Erie Mining. The uniformity clause argument elucidated by Erie is founded on attacking the tax as a production tax. Defining the tax as a property tax utilizing production as a method of computation eliminates this problem and allows this court to avoid a constitutional analysis involving a potential uniformity clause violation. As this court has explicated, "[d]ouble taxation is objectionable in a legal sense only when the same property or person is taxed twice for the same purpose for the same taxing period by the same taxing authority without taxing all property and persons in the same class a second time." *Milwaukee Motor Transportation Co. v. Commissioner of Taxation,* 292 Minn. 66, 77, 193 N.W.2d 605, 612 (1971), citing *State v. Railway Express Agency, Inc.,* 210 Minn. 556, 567, 299 N.W. 657, 662 (1941).

■ Double taxation cannot occur if this tax is considered a property tax. The taconite tax does not tax the same property twice, nor does it tax twice for the same taxing period. It taxes the same entity only once by using a *computation method* that happens to span one to three years. The means adopted by the legislature is within the applicable constitutional and statutory limitations and within the realm of legislative discretion. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464–66, 101 S.Ct. 715, 723–25, 66 L.Ed.2d 659 (1981).

■ 3. The equal protection argument advanced by Erie also fails upon analysis. Erie maintains that Minn.Stat. § 298.24 not only results in double taxation but also

creates two classes of taconite producing property taxpayers. Erratic or steadily declining producers compose one class and stable or steadily increasing producers compose the second class. Under Minn. Stat. § 298.24, the first class of taxpayers pays more taxes than the second class which is rewarded for maintaining stable or increasing levels of production.

From an analytical standpoint, this court has held that the Minnesota constitutional provision that taxes shall be uniform upon the same class of subjects is interpreted to be no more restrictive upon the legislature's power to tax than the equal protection clause of the Fourteenth Amendment to the United States Constitution. *Matter of McCannel*, 301 N.W.2d 910, 916 (Minn. 1980). It follows that any discussion and analysis of the uniformity clause is co-extensive and of equal application to the equal protection clause.

 The parties correctly concede that the standard of review of this tax statute is the rational basis test. It has been stated in this way:

> The propriety of classification for the purpose of legislation is primarily for the legislature. Laws passed by the legislature are presumed to be valid, so we assume that the legislature makes inquiry and rightly determines the propriety of the classification which it adopts. *This court will not disturb the legislative determination unless the classification is clearly arbitrary and has no reasonable basis.*

*Id.* at 917, quoting *In re Taxes on Property of Cold Spring Granite Co.*, 271 Minn. 460, 466, 136 N.W.2d 782, 787 (1965) (emphasis added in *McCannel*). The court, in *McCannel*, went on to quote this passage from *San Antonio School District v. Rodriquez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1301–02, 36 L.Ed.2d 16 (1973), in support of its statement that courts have given legislative classifications especially wide latitude in the area of taxation:

> "The broad discretion as to classification possessed by a legislature in the field of taxation has long been recog-

nized. * * * [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. * * * It has * * * been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification."

* * * No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.

301 N.W.2d at 917. The legislature has broad discretion in making a classification, and if any reasonable ground for making a distinction can be found, a court should sustain the classification. *Id.*

This court has on many occasions upheld a classification in a tax statute against a challenge that it violated the uniformity and equal protection clauses. *See, e.g., Hegenes v. State*, 328 N.W.2d 719, 723 (Minn. 1983) (classification of nonhomestead residential properties for purposes of real estate taxation into those of three units or less and those properties with four or more units constitutional); *Petition of U.S. Steel Corp.*, 324 N.W.2d 638, 641–43 (Minn.1982) (retroactive assessment of taxes on iron ore for six-year period constitutional); *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138, 142–43 (Minn.1980) (farm loss modification law held constitutional); *Miller Brewing Co. v. State*, 284 N.W.2d 353 (Minn.1979) (50% credit allowed against excise tax imposed on barrels of malt beverages produced by brewers with production facilities in the state constitutional). The test to determine the constitutionality of statutory classifications includes three primary elements:

> (1) The distinctions which separate those included within the classification

from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve. *Schwartz v. Talmo* [295 Minn. 356, 205 N.W.2d 318], *supra; Montgomery Ward & Co., Inc. v. Commr. of Taxation*, 216 Minn. 307, 12 N.W.2d 625 (1943).

*Miller Brewing Co. v. State*, 284 N.W.2d 353, 356 (Minn.1979).

■ This court takes this occasion to reorder the three elements of the *Miller* test so the equal protection analysis proceeds in a more logical and coherent fashion. The best way to apply the *Miller* test is to invert the sequence and start with number three and conclude with number one.

These three elements appear to be satisfied in the Erie case on appeal. First, the purpose of the statute must be one that the state can legitimately attempt to achieve. The tax court held:

> [W]e can assume that in 1977 the legislature was well aware of the loss of revenues as a result of the production fall off and that the enactment of the three-year averaging rule was an attempt to stabilize the income for range communities and school districts. We consider that to be a legitimate legislative concern and a proper subject for legislative action.

The tax court and Erie concede that stabilization of income for range communities is a legitimate subject for legislative action. Erie, however, believes that stable revenues could be completely achieved without taxing more than 100% of actual production or discriminating among producers by applying the averaging method in every year.

What Erie fails to realize is that *any* legitimate purpose can support the tax.

*See Matter of McCannel*, 301 N.W.2d 910, 917 (Minn.1980). Any reasonable ground can be used to support this tax. Erie's contention that the state could achieve its purpose without utilizing the alternative method is without merit. Erie, in effect, is subjecting the statute to a higher level of review. It is using the strict scrutiny standard since it argues that a less restrictive alternative could be used. Whether there is a less restrictive way to achieve the state's goals is an inappropriate inquiry in reviewing a statute under the rationally related approach. If the state's objectives are being met in a rational manner, the inquiry stops.

That leads this court to the second and third elements of the equal protection test announced in *Miller*, whether the classification is genuine or relevant to the purpose of the law and whether the legislation is arbitrary or fanciful. The classifications appear to be rationally related to the purpose of the statute. Section 298.24 differentiates erratic or steadily declining producers from stable or steadily increasing producers. This distinction is genuine and substantial and historically reflects the nature of the taconite mining industry in recent years. Unstable production patterns produce varying amounts of revenue for local school districts and municipalities. For instance, Erie has from 1976 to 1980 produced the following approximate amounts of taconite yearly, expressed in millions of tons: 10.8 in 1976, 4.6 in 1977, 7.6 in 1978, 9.8 in 1979, 5.9 in 1980. This production pattern demonstrates the inconsistency of Erie's production over the five-year period.

The statute in this case appears to be meeting its objectives. The statute provides a tax incentive to be a steady producer. An erratic or declining producer receives tax disincentives since its tax obligation increases. Steady production, in turn, provides steady revenues to local governments. Steady production also conserves resources and guards against the rapid depletion of taconite and other minerals to which the economic vitality of northern

Minnesota is so closely tied. The classification, therefore, is genuine and relevant to the purpose of the law and is not arbitrary or fanciful. The taconite tax statute does not violate the equal protection or uniformity clauses.

4. Erie's next contention is that the taconite tax violates due process as retroactively applied. The new taxing method utilized in Minn.Stat. § 298.24 was introduced in April and adopted in May of 1977. In 1977 the averaging method was used to compute Erie's tax. This included the years 1975 and 1976. In 1978, the averaging method was also used and included tax years 1976 and 1977. Erie claims that had it received notice or known that the legislation would average in production for 1975 and 1976, it would have altered production patterns and saved itself taxes. As it happened 1976 was a peak production year in the three year average and Erie paid higher taxes. The method utilized before the new taxing statute was the annual production method. Erie contends, just as it does in its equal protection and uniformity clause arguments, that alternating the averaging method after utilizing the annual production method taxes the peak production of 1976 twice. Erie suggests this could have been avoided by giving iron ore producers notice or changing the method of computation in the transition year in which the statute was phased in. This, Erie states, violates due process.

This question, as with the question of double taxation, can be resolved by determining whether this is a property tax or a production tax. If it is a property tax, it has no retroactive application, since it only uses a formula that averages two previous years' production with the production in the taxable year. If it is considered a production tax, then a due process analysis must be completed. Since we have previously concluded that this tax is a property tax, we need not reach the constitutional issue.

5. Finally, Erie contends that if the averaging method is used, the Commissioner must also average the iron content

adjustment contained in Minn.Stat. § 298.-24, subd. 1(b) and the price index adjustment contained in subd. 1(a). Apparently, the Commissioner concedes that there must be an averaging of the iron content adjustment under the statutory language. However, the Commissioner contends that the price index language contained in a separate subsection does not require averaging. We disagree. The statute refers to the price index during the production year. If an averaging alternative is used, there is no current production year figure except as it is contained in the average. Thus, it seems reasonable and logical that an average of the price index should be used. We reverse the tax court's decision not to average the price index adjustment.

Affirmed in part, reversed in part.

YETKA, Justice (concurring specially).

I concur only because it is obvious that this court will not adopt the position I took in my dissents from *In re United States Steel Corporation,* 324 N.W.2d 638 (Minn. 1982) and *AFSCME Council 6 v. Sundquist,* 338 N.W.2d 560 (Minn.1983). However, the reasoning set forth in those dissents applies to this case as well.